SICANOFF VEGETABLE OIL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SICANOFF TALLOW CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53637, 53638.    Filed March 29, 1957.

*John E. Hughes, Esq., John W. Hughes, Esq.,* and *Harold R. Burnstein, Esq.,* for the petitioners.

*Harold H. Hart, Esq.,* for the respondent.

PIERCE, *Judge:* These cases, which were consolidated for trial, involve deficiencies in income tax and in personal holding company surtax, determined by the respondent as follows:

DOCKET No. 53637. SICANOFF VEGETABLE OIL CORPORATION

| Fiscal year ended— | Deficiencies | |
|---|---|---|
| | Income tax | Personal holding company surtax |
| Feb. 28, 1950 | $168.25 | $13,485.79 |
| Feb. 28, 1951 | | 759,062.62 |
| Feb. 29, 1952 | | 291,063.47 |

DOCKET No. 53638. SICANOFF TALLOW CORPORATION

| Fiscal year ended— | Deficiencies | |
|---|---|---|
| | Income tax | Personal holding company surtax |
| July 31, 1950 | $5,465.80 | $40,132.89 |
| July 31, 1951 | 19,967.53 | |

All issues raised by the pleadings, except that pertaining to the determined deficiencies in personal holding company surtax, have been settled by stipulations of the parties; and, accordingly, the sole remaining issue for decision is whether each of the petitioner corporations, during its fiscal years involved, was a personal holding company within the meaning of sections 500 and 501 of the Internal Revenue Code (1939).[1]

---

[1] SEC. 500. SURTAX ON PERSONAL HOLDING COMPANIES.

There shall be levied, collected, and paid, for each taxable year beginning after December 31, 1938, upon the undistributed subchapter A net income of every personal holding company (in addition to the taxes imposed by chapter 1) a surtax equal to the sum of the following:

(1) 75 per centum of the amount thereof not in excess of $2,000; plus
(2) 85 per centum of the amount thereof in excess of $2,000.

SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of:

(a) Dividends, interest (other than interest constituting rent as defined in subsection (g)), royalties (other than mineral, oil, or gas royalties), annuities.

(b) STOCK AND SECURITIES TRANSACTIONS.—Except in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities.

(c) COMMODITIES TRANSACTIONS.—Gains from futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange. This subsection

There is no question that each corporation does meet the stock ownership requirement for personal holding company classification, specified in section 501 (a) (2) ; but a dispute exists as to whether either of them meets the gross income requirement for such classification, specified in section 501 (a) (1). The determination of whether such gross income requirement actually has been met, and thus whether each petitioner was a personal holding company, requires answers to the following questions:

1. Should the Court consider a question not raised by the pleadings, concerning the amounts of the gross profits of Sicanoff Vegetable Oil Corporation from sales of "actual" commodities?

2. Are the provisions of section 118 of the 1939 Code (pertaining to losses from wash sales of stock or securities) applicable to losses from futures transactions on a board of trade or commodity exchange?

3. Did any of the gains of either petitioner from its commodities futures transactions arise out of bona fide hedging transactions within the meaning of section 502 (c) of the Code?

4. In determining the amount of the personal holding company income of each petitioner, does "the portion of the gross income which consists of * * * gains from futures transactions," as specified in section 502 (c), include the aggregate of the gains from non-hedging futures transactions, without adjustment or diminution on account of deductible losses from such transactions; or does it include only the excess of gains over losses from such transactions?

FINDINGS OF FACT.

Certain facts have been stipulated. The stipulations, together with the exhibits thereto attached, are incorporated herein by reference.

*Facts re Sicanoff Vegetable Oil Corporation.*

Sicanoff Vegetable Oil Corporation (hereinafter called Vegetable Oil Corporation) was incorporated on March 15, 1949, under the laws of the State of Indiana and had its offices in Indianapolis. It kept its books and records and rendered its tax returns for all years involved in accordance with the accrual method of accounting and on the basis of fiscal years ended February 28 or 29. It filed its income tax returns for all fiscal years involved with the then collector of internal revenue for the district of Indiana.

---

shall not apply to gains by a producer, processor, merchant, or handler of the commodity which arise out of bona fide hedging transactions reasonably necessary to the conduct of its business in the manner in which such business is customarily and usually conducted by others.

    (d) ESTATES AND TRUSTS. * * *

    (e) PERSONAL SERVICE CONTRACTS. * * *

    (f) USE OF CORPORATION PROPERTY BY SHAREHOLDER. * * *

    (g) RENTS. * * *

    (h) MINERAL, OIL, OR GAS ROYALTIES. * * *

All outstanding capital stock of the corporation was owned by not more than four individuals.

The business of Vegetable Oil Corporation was that of buying and selling soybean oil and crude coconut oil (hereinafter sometimes called "actual" commodities). The purchases and sales of such oils were handled through a broker; they were directly between it and various domestic corporations; and they were not made through or subject to the rules of a board of trade or commodity exchange. The oils were generally bought and sold in carload lots. In some cases, the contracts of purchase or sale provided for immediate delivery; but in most cases they provided for "forward delivery" of from 1 to 6 months in the future.

Often, Vegetable Oil Corporation sold oil for forward delivery, which it at the time neither owned nor held under contract; and then, prior to the delivery date, it would obtain a forward purchase contract for such oil, and give instructions for shipment direct to its buyer. In other cases, it would buy oil for forward delivery and then, prior to the delivery date, either sell the oil back to the original seller or sell it to another party. In a few instances, it took delivery of oil purchased, held the same in railroad tank cars until a sale of the same could be arranged, and then gave directions for shipment of the cars to its buyer.

The oil purchased and sold under the above-mentioned contracts was subject to market fluctuations in price; and the only way in which Vegetable Oil Corporation made its profits was by taking advantage of such fluctuations. It did not produce, process, grade, store, or otherwise physically handle any of the oils; and all shipments of oil were made by public carriers. The nature of its assets and liabilities per books, as of the close of its fiscal year ended February 28, 1950 (which was similar for all years involved), was as follows:

*Assets*

| | | |
|---|---:|---:|
| Current assets: | | |
| Cash in bank | $21,146.89 | |
| Petty cash | 50.00 | |
| Customers' deposits | 4,956.25 | |
| Brokers' deposits | 109,387.44 | |
| Accounts receivable—trade | 65,096.37 | |
| Total current assets | | $200,636.95 |
| Fixed assets (after depreciation): | | |
| Furniture and fixtures | $3,601.74 | |
| Leasehold improvements | 2,641.50 | |
| Total fixed assets | | 6,243.24 |
| Total assets | | $206,880.19 |

*Liabilities*

Current liabilities:

| | | |
|---|---|---|
| Notes payable—intercompany | $128, 000. 00 | |
| Accounts payable—intercompany | 2, 840. 79 | |
| Accounts payable—officers | 5, 000. 00 | |
| Taxes payable | 40. 38 | |
| Drafts discounted | 62, 989. 06 | |
| Total current liabilities | | $198, 870. 23 |

Capital:

| | | |
|---|---|---|
| Capital stock | $30, 000. 00 | |
| Net loss for year (as originally reported) | (21, 990. 04) | 8, 009. 96 |
| Total liabilities | | $206, 880. 19 |

In addition to the above-mentioned actual transactions in soybean oil and coconut oil, Vegetable Oil Corporation engaged extensively in "futures" transactions in commodities, on or subject to the rules of boards of trade or commodity exchanges. These futures transactions were all handled through orders delivered to a broker. They included both "long" and "short" transactions in a wide variety of commodities, including cottonseed oil, soybean oil, soybean meal, soybeans, lard, hides, wheat, corn, rye, oats, eggs, cocoa, coffee, sugar, and rubber. The corporation did not make or accept delivery of any commodity covered by such futures contracts; but, in each instance, prior to the specified delivery date, it offset each futures contract by another long or short futures contract obtained through the same broker. At the end of each month, the broker would issue to it a statement showing the condition of its account, and specifying the extent of its long or short positions in futures for the various commodities.

The results of the operations of Vegetable Oil Corporation for all years involved, as regards both its transactions in actuals and its transactions in futures, and also the total distributions (if any) to stockholders that were charged to earned surplus during each taxable year, were as follows:

Actuals: *Fiscal year ended February 28, 1950.*

| | | |
|---|---|---|
| Gross sales | | $837, 783. 22 |
| Cost of goods sold | | 800, 285. 00 |
| Gross profit from sales | | $37, 498. 22 |

Futures (approximately 1,000 purchases and sales):

| | *Gains* | *Losses* |
|---|---|---|
| Soybeans | $57, 001. 25 | $150, 928. 75 |
| Lard | 29, 700. 00 | 16, 260. 00 |
| Cottonseed oil | 103, 624. 00 | 48, 085. 00 |
| Wheat | 12, 291. 25 | 6, 526. 25 |
| Corn | 13, 810. 00 | 23, 270. 00 |
| Rye | 2, 462. 50 | 13, 242. 50 |
| Oats | 1, 710. 00 | 4, 035. 00 |
| Soybean oil | 846. 00 | 1, 068. 00 |
| Hides | 12, 204. 00 | 276. 00 |
| Cocoa | | 965. 00 |
| Sugar | | 889. 60 |
| Rubber | 500. 96 | |
| Coffee | | 8, 243. 75 |

Futures (approximately 1,000 purchases and sales)—

| Continued | Gains | Losses |
|---|---|---|
| Insurance charge, soybean oil_____ | | $0.67 |
| Credit memorandum_____ | $18.00 | ----------- |
| Received delivery soybeans_____ | 10.00 | ----------- |
| Total_____ | $234,177.96 | $273,790.52 |

Total distributions to stockholders charged to earned surplus during the taxable year_____ None

Actuals:  *Fiscal year ended February 28, 1951.*

| | |
|---|---|
| Gross sales_____ | $4,576,603.69 |
| Cost of goods sold_____ | 4,044,540.89 |
| Gross profit from sales_____ | $532,062.80 |

Futures (number of purchases and sales not established):

| | Gains | Losses |
|---|---|---|
| Soybeans_____ | $993,414.00 | $123,409.50 |
| Soybean oil_____ | 130,758.00 | 31,896.00 |
| Lard_____ | 77,970.00 | 4,530.00 |
| Rye_____ | 7,872.50 | 62,981.25 |
| Wheat_____ | | 6,437.50 |
| Cottonseed oil_____ | 407,826.00 | 13,089.00 |
| Corn_____ | 80,631.25 | 1,652.50 |
| Eggs_____ | | 53,006.40 |
| Oats_____ | 582.50 | 51,062.50 |
| Credit memorandum_____ | 310.00 | ----------- |
| Total_____ | $1,699,364.25 | $348,064.65 |

Total distributions to stockholders charged to earned surplus during the taxable year_____ $48,400

Actuals:  *Fiscal year ended February 29, 1952.*

| | |
|---|---|
| Gross sales_____ | $6,651,732.46 |
| Cost of goods sold_____ | 6,137,650.45 |
| Gross profit from sales_____ | $514,082.01 |

Futures (number of purchases and sales not established):

| | Gains | Losses |
|---|---|---|
| Soybean oil_____ | $694,086.00 | $260,034.00 |
| Rye_____ | 67,557.50 | ------------ |
| Soybeans_____ | 538,379.75 | 385,478.50 |
| Cottonseed oil_____ | 418,749.00 | 182,694.00 |
| Wheat_____ | 45,049.25 | 955.50 |
| Corn_____ | 37,482.00 | ------------ |
| Cotton_____ | 72,175.00 | 13,775.00 |
| Soybean meal_____ | 9,790.00 | 6,150.00 |
| Oats_____ | 34,432.50 | ------------ |
| Credit and debit memorandum_____ | 33.00 | 168.00 |
| Total_____ | $1,917,734.00 | $849,255.00 |
| Interest income_____ | | $7,090.52 |

Total distributions to stockholders charged to earned surplus during the taxable year_____

[1] $19,400
[2] $474,750

[1] Cash.
[2] Stock of the corporation.

None of the gains from futures transactions of Vegetable Oil Corporation, for any of its fiscal years here involved, arose out of bona fide hedging transactions, within the meaning of section 502 (c) of the 1939 Code.

### Facts re Sicanoff Tallow Corporation.

Sicanoff Tallow Corporation (hereinafter called Tallow Corporation) was incorporated on December 1, 1947, under the laws of the State of Indiana. It, like Vegetable Oil Corporation, had its office in Indianapolis; and it was controlled and operated by substantially the same persons. At all times material, its entire outstanding capital stock was owned by not more than four individuals. It kept its books and records and rendered its tax returns in accordance with the accrual method of accounting and on the basis of fiscal years ended July 31. For all years involved, it filed its income tax returns with the then collector of internal revenue for the district of Indiana.

The business of Tallow Corporation was similar to that of Vegetable Oil Corporation, except that it bought and sold tallow and edible grease instead of vegetable oils. Its purchases and sales of such actuals were, like the corresponding transactions of Vegetable Oil Corporation, handled through a broker; were made directly between it and various domestic corporations; and were not made through or subject to the rules of a board of trade or commodity exchange. It generally dealt in carload lots. Most of its contracts for purchase or sale of the above-mentioned actual commodities provided for forward delivery of from 1 week to 1 month in the future; and the method by which these forward contracts were handled, and the manner in which the corporation made its profits, were substantially the same as those of Vegetable Oil Corporation.

The nature of the assets and liabilities per books of Tallow Corporation, as of the close of its fiscal year ended July 31, 1950, was as follows:

*Assets*

Current assets:
| | | |
|---|---:|---:|
| Cash in bank | | $100, 113. 33 |
| Accounts receivable: | | |
|     Brokers—cash account | $1, 012. 50 | |
|     Brokers—regulated account | 172, 312. 04 | |
|     Trade | 71, 345. 98 | |
|     Intercompany | 1, 108. 29 | |
|     Miscellaneous | 3, 500. 00 | |
| | | 249, 278. 81 |
| Tax account | | 8, 500. 00 |
| Inventory | | 31, 231. 03 |
|     Total current assets | | $389, 123. 17 |

Other assets:
| | | |
|---|---|---|
| Auto equipment (after depreciation)_____ | $13, 256. 50 | |
| Furniture and fixtures (after depreciation)_____ | 1, 449. 93 | |
| Insurance_____ | 199. 80 | |
| | | $14, 906. 23 |
| Total assets_____ | | $404, 029. 40 |

### *Liabilities*

Current liabilities:
| | | | |
|---|---|---|---|
| Drafts discounted_____ | | $38, 453. 38 | |
| Accounts payable: | | | |
| Trade_____ | $4, 850. 19 | | |
| Officers_____ | 5, 284. 18 | | |
| Intercompany_____ | 1, 689. 00 | | |
| | | 11, 823. 37 | |
| Advances payable—officers_____ | | 10, 000. 00 | |
| Taxes payable: | | | |
| Federal income tax_____ | $23, 704. 67 | | |
| Miscellaneous tax_____ | 5, 238. 96 | | |
| | | 28, 943. 63 | |
| Total current liabilities_____ | | | $89, 220. 38 |
| Capital: | | | |
| Capital stock_____ | | $40, 000. 00 | |
| Earned surplus and undivided profits_____ | | 274, 809. 02 | |
| | | | 314, 809. 02 |
| Total liabilities_____ | | | $404, 029. 40 |

In addition to its above-mentioned transactions in tallow and grease, this corporation, like Vegetable Oil Corporation, engaged extensively in futures transactions in commodities, on or subject to the rules of boards of trade or commodity exchanges. These futures contracts were all handled through orders delivered to a broker; and they included both long and short transactions in a wide variety of commodities. The corporation, like Vegetable Oil Corporation, did not make or accept delivery of any commodity covered by a futures contract; but, in each instance, prior to the specified delivery date, it offset each futures contract by another long or short futures contract obtained through the same broker.

The results of the operations of Tallow Corporation for its fiscal year ended July 31, 1950, both as regards its actual transactions in tallow and grease and as regards its futures transactions, were as follows:

### *Fiscal year ended July 31, 1950.*

Actuals and other non-personal holding company income:
| | |
|---|---|
| Gross sales_____ | $3, 557, 320. 25 |
| Cost of goods sold_____ | 3, 461, 580. 83 |
| Gross profit from sales_____ | $95, 739. 42 |
| Other non-personal holding company income_____ | 2, 220. 64 |
| Total_____ | $97, 960. 06 |

| Futures (between 800 and 900 purchases and sales): | Gains | Losses |
|---|---|---|
| Lard | $49, 790. 00 | $68, 030. 00 |
| Soybeans | 240, 486. 25 | 94, 271. 25 |
| Cottonseed oil | 29, 808. 00 | 1, 416. 00 |
| Wheat | 7, 435. 00 | 5, 968. 75 |
| Corn | 73, 672. 50 | 18, 791. 25 |
| Rye | 22, 272. 75 | 41, 433. 75 |
| Hides | 4, 872. 00 | ------------ |
| Rubber | 875. 60 | ------------ |
| Soybean oil | 1, 800. 00 | ------------ |
| Eggs | ---------- | 136. 80 |
| Oats | ---------- | 28, 766. 25 |
| Cocoa | ---------- | 574. 00 |
| Correction memos | 400. 00 | 525. 00 |
| Total | $431, 412. 10 | $259, 913. 05 |
| Total distributions to stockholders charged to earned surplus during the taxable year | | None |

None of the gains from futures transactions of Tallow Corporation, for its fiscal year ended July 31, 1950, arose out of bona fide hedging transactions, within the meaning of section 502 (c) of the 1939 Code.

Both petitioners, in computing their income for all years involved, used the inventory method in respect of their actuals, to determine the cost of goods sold and the gross profit from sales; although Vegetable Oil Corporation had no opening or closing inventory for its fiscal year ended February 28, 1950, and no closing inventory for its fiscal year ended February 29, 1952.

Each of the petitioners, in its income tax return for each of the years involved, reported its gross profits from sales of actual commodities as ordinary income; but it treated all gains and losses from futures transactions as having been realized from sales of capital assets. Neither petitioner, in computing and returning its income for any year, identified or treated any of its commodity futures transactions as having been a hedging transaction.

The respondent, in his notices of deficiency, made no adjustment to the gross income of any year, as reported by the petitioners on their respective returns; but he did make certain adjustments to the deductions claimed for business expenses (all of which have now been settled by stipulation). Also, in said notices of deficiency, the respondent determined that each of the petitioner corporations was a personal holding company during each of its fiscal years for which a deficiency in personal holding company surtax was determined as hereinabove shown.

At least 80 per cent of the gross income of each petitioner for its fiscal year ended in 1950, and at least 70 per cent of the gross income

of Vegetable Oil Corporation for each of its fiscal years ended in 1951 and 1952, was personal holding company income as defined in section 502 of the 1939 Code.

Each of the petitioners was a personal holding company within the meaning of sections 500 and 501 of the 1939 Code, during each of its fiscal years for which the respondent determined a deficiency in personal holding company surtax.

OPINION.

The basic issue here presented, as we have before stated, is whether each of the petitioner corporations was, during its fiscal years involved, a personal holding company within the meaning of sections 500 and 501 of the 1939 Code. Said statute imposes a special surtax on undistributed income of corporations which are so classified.

The determination of the above issue depends on whether each of the petitioners meets the gross income requirement for such classification, as set forth in section 501 (a) (1) ; because there is no dispute that each of them does meet the supplemental stock ownership requirement for such classification, as set forth in section 501 (a) (2).

The position of the petitioners is that neither meets such gross income requirement for any of the years involved. In support thereof, they have presented four principal contentions which we shall consider, separately.

*I.*

Vegetable Oil Corporation contended at the trial for the first time, and without making any attempt to amend its petition or to revise the stipulation of facts which was received by agreement of the parties, that the amount of its gross profit from sales of actual commodities, as shown on its income tax return for each of its fiscal years 1950 and 1951, should be adjusted and revised. It argued that its gross profit from sales for the year 1951, which it returned in the amount of $532,062.80, should be decreased by the amount of $8,082.50; and that the amount of its gross profit from sales for 1950 should be increased by the same amount.

There is nothing in the deficiency notice or in the pleadings to suggest such an issue; and the respondent complained that he had not been informed regarding the same until a few minutes before the opening statement, and that he had had no opportunity to meet it in his answer. Also, the stipulation of facts does not make any provision for raising such issue. To the contrary, the stipulation sets forth the amount of petitioner's gross profit from sales for each of the years 1950 and 1951, as shown on its books and returns; states that, for the year 1951, "petitioner's gross profit from sales was $532,062.80 as re-

ported"; and further states that the facts set forth in the stipulation "may be taken as true upon the trial of this cause."

This Court has held on numerous occasions that it will not, and cannot, consider issues which have not been pleaded. *Lynne Gregg*, 18 T. C. 291, affirmed per curiam 203 F. 2d 954 (C. A. 3); *Samuel E. Hirsch*, 16 T. C. 1275; *F. P. Dastague*, 19 B. T. A. 1324. Accordingly, we decline to pursue further the above-mentioned contention. The suggested issue is not properly before this Court.

## II.

Both petitioners have contended that the provisions of section 118 of the 1939 Code (pertaining to loss from wash sales of stock or securities) should be applied to certain of their losses from commodity futures transactions of their fiscal years ended in 1950. They suggest that, if deductions for such losses are not allowed pursuant to said statute, the cost basis of certain of their futures contracts will be increased pursuant to section 113 (a) (10); and that, by reason thereof, the amounts of their total gains from futures transactions in the year 1950 would be less than the amounts reported on their returns and agreed to in the stipulations of facts.

Such contention of the petitioners must be rejected. In *Corn Products Refining Co.*, 16 T. C. 395, we held that the provisions of section 118 are not applicable to transactions in commodity futures contracts. Such holding was affirmed by the Court of Appeals for the Second Circuit (215 F. 2d 513); and the decision of the Court of Appeals was thereafter affirmed, on other grounds, by the Supreme Court (350 U. S. 46). These decisions are dispositive of the question here presented.

## III.

Another contention, presented by both petitioners, is that certain of the gains from their commodity futures transactions arose out of bona fide hedging transactions, within the meaning of section 502 (c) of the 1939 Code; and that, if such gains are eliminated under the provisions of said section, neither petitioner will have sufficient personal holding company income to qualify it as a personal holding company.

A hedge was defined by the Court of Appeals for the Fifth Circuit in *Commissioner* v. *Farmers & G. C. Oil Co.*, 120 F. 2d 772, 774, certiorari denied 314 U. S. 683, as follows:

A hedge is a form of price insurance; it is resorted to by businessmen to avoid the risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position.

Substantially this same concept has been recognized by the Supreme Court in *United States* v. *Coffee Exchange*, 263 U. S. 611, 619; by the Internal Revenue Service in G. C. M. 17322, XV-2 C. B. 151, which the Supreme Court cited with approval in *Corn Products Co.* v. *Commissioner*, 350 U. S. 46; and by various textwriters and commentators.[2]

Generally, where a hedge is made, a position is taken in the futures market to offset a risk with respect to actuals. The purchase or sale of a futures contract to offset the risk of holding another futures contract does not ordinarily qualify as a bona fide hedge—for such risk is a speculative one, and is not attached to the holding of a commodity expected to be used or marketed in a business.[3] The authorities indicate that, in order to have a bona fide hedge, there must be: (1)

---

[2] See: Patterson, "Hedging and Wagering on Produce Exchanges," 40 Yale L. J. 843; Rich and Rippe, "Tax Aspects of Commodity Futures Transactions with a Business Purpose," 2 Tax L. R. 541; Hoffman, Future Trading (1932), p. 382.

G. C. M. 17322, above mentioned, contains two examples of hedging as follows:

(1) The taxpayer buys quantities of spot cotton, which will necessarily be on hand for some months before being manufactured into goods and sold. In order to be protected against losses which would be incurred if the cotton market declined during those months, the taxpayer, at the same time the above purchases are made, enters into futures sale contracts for the delivery of equivalent amounts of cotton a few months hence. As the above quantities of spot cotton are subsequently disposed of by sales from time to time of manufactured cotton goods, the above futures sale contracts are concurrently disposed of by futures purchase contracts which serve as offsetting transactions closing out the futures sale contracts.

(2) The taxpayer makes contracts for future delivery of cotton goods, the manufacture of which will require more cotton than the amount on hand or the amount which can be immediately purchased advantageously. In order to secure protection against a rising cotton market during the months that intervene between the date of the order for cotton goods and the agreed delivery date, the taxpayer, at the same time the above orders are taken, enters into futures purchase contracts for cotton in amounts necessary to provide the desired protection. As the taxpayer from time to time buys spot cotton for the manufacture of the goods specified in the above orders, the futures purchase contracts are disposed of by futures sale contracts which serve as offsetting transactions closing out the futures purchase contracts.

The authorities indicate, however, that a hedge need not be similar, in all respects, to one of the above-mentioned classic examples. The commodity involved in the futures contract need not be the same as the actual commodity hedged, if the two commodities are so related that their prices normally rise and fall together. *Albert Kurtin*, 26 T. C. 958. Also, the contract for the commodity futures need not be in the exact amount of the actual commodity being hedged. *Kenneth S. Battelle*, 47 B. T. A. 117. And the initiation and termination of the futures transaction need not coincide precisely with the initiation and termination of the risk in the actual. *Ben Grote*, 41 B. T. A. 247. However, in each instance, all surrounding facts and circumstances must be scrutinized, in order to ascertain whether a particular transaction was *intended to be a* hedge, or a speculation. A demonstrable relation must be shown to exist between the futures transaction and the business risk claimed to be hedged. See *Kenneth S. Battelle, supra.*

[3] The Treasury regulations recognize that it is possible to have a hedge against concurrent futures. Regs. 111, sec. 29.502-1 (6). But the expert testimony herein indicates that this can occur only in unusual circumstances—as for example, where one has hedged a risk in an actual, by buying futures; has found, after the risk in the actual has expired, that he cannot "lift" the hedge, because of the narrowness or the closing of the market in which the futures were acquired; and, hence, that in order to obtain protection, he must go to a different market to buy or sell offsetting futures.

A risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk.

In the instant case, the general pattern of petitioners' transactions is inconsistent with bona fide hedging. Neither of the petitioners produced, processed, graded, stored, transported, or otherwise physically handled any of the actual commodities which they bought or sold. Their sole means of making profit in such actuals was to take advantage of fluctuations in the market prices—as for example, by buying oil or tallow on forward delivery contracts at a time when the market appeared favorable; and then reselling the same, before the delivery date and when the market "so dictated," either back to the original seller or to some other party. Since market fluctuations were their sole means of profit, it is evident that hedging to neutralize such fluctuations would have eliminated the very factor on which they depended for the success of their businesses.[4]

The manner in which petitioners recorded and reported their futures transactions is likewise inconsistent with hedging. Both corporations made numerous purchases and sales of futures contracts; Vegetable Oil Corporation had approximately 1,000 such purchases and sales in its fiscal year 1950 alone, and Tallow Corporation had between 800 and 900 in its fiscal year 1950 alone. Only a small portion of these are even claimed to have been hedges; and no claim or evidence was presented as to any hedges in subsequent years. Neither petitioner, on its books, records, and returns, identified or treated any of its transactions as having been a hedge. And, on their returns, both reported all gains and losses from futures transactions as having been derived from the sale of *capital assets*—whereas gains and losses from hedging would have been elements in computing the *ordinary income* of their businesses. (See decision of the Supreme Court in *Corn Products Co.* v. *Commissioner, supra.*)

As regards the relatively few futures transactions which are claimed to have been hedges, the evidence is both indefinite and unsatisfactory. It consists (in addition to the stipulations of facts which contain no agreed facts regarding hedging) of: (a) 4 schedules, entitled "Alleged hedges of concurrent futures" and "Alleged hedges of actual contracts against futures," which merely identify the particular trans-

---

[4] The expert testimony herein establishes that the purpose and intention of a hedger differ from those of a speculator. The hedger undertakes to avoid the risk of market fluctuations, and to make his money by other means than changes in the price level of the principal raw materials in which he deals. The speculator, on the other hand, intends to make his money by taking advantage of market price fluctuations.

actions alleged to have been hedges; [5] (b) 4 large bundles of brokers' confirmations of purchases and sales of actuals and futures, for 1 year only; (c) 2 smaller bundles of brokers' monthly statements, likewise for 1 year only; and (d) the testimony of an accountant and of an officer of the petitioners.

The bundles of brokers' statements and confirmations show that numerous transactions took place; but they do not show the purpose or intention as to any transaction. Also even though some of the transactions have proximate dates, such proximate dates are not sufficient, in themselves, to establish hedging.

The accountant had no personal knowledge of any of the transactions involved; and his testimony was directed principally to explaining how he and the officer had selected the alleged hedges. He said that, as to the concurrent futures, they brought together transactions which were "on the board at the same time"; and that the headings on the schedules were not reflected on the books.

The officer testified in general terms—to the effect that he believed the petitioners were entitled to hedge, and did hedge; and that hedging was necessary in businesses such as theirs. He did not analyze a single one of the alleged hedging transactions, or show the purpose or intention which prompted its being entered into; and he did not establish the existence of a risk position, at the time of any of the alleged hedges, by showing the relative long and short positions in futures and in actuals at that time. The testimony of both the officer and the accountant revealed that the alleged hedge transactions had not been selected until after the issuance of the notices of deficiency; and that none of them had been matched on the books and records of the petitioners, in the manner that they were matched on the schedules presented.

The respondent presented the testimony of an expert witness who had outstanding qualifications and wide experience, both with commodity futures markets and with the characteristics of hedging. This witness testified that he had examined each of the transactions which the petitioners alleged to be a hedge, as well as the several other transactions disclosed in the brokers' statements; and that he also had examined the exhibits and heard the testimony of petitioners'

---

[5] The above-mentioned schedules are too voluminous to set forth here.

One of the schedules for Vegetable Oil Corporation lists gains from the purchase and sale of 12 futures, alleged to have been hedged against 17 purchases and 18 sales of alleged concurrent futures. And another schedule for the same corporation lists gains from the purchase and sale of 23 futures, alleged to have been hedged against 32 purchases and sales of actuals.

One of the schedules for Tallow Corporation lists gains from the purchase and sale of 11 futures, alleged to have been hedged against 19 purchases and sales of alleged concurrent futures. And another schedule for said corporation lists gains from the purchase and sale of 17 futures, alleged to have been hedged against 68 purchases and sales of actuals.

At least 10 of the actuals of Tallow Corporation cannot be identified among the brokers' confirmations which were received in evidence.

witnesses. He further testified that in his opinion, based on analysis of all the evidence, none of the transactions of either petitioner for the fiscal years involved is identifiable as a hedging transaction.

The expert witness, in support of his opinion, analyzed the several transactions which the petitioners claimed to have been hedges; and he explained the reasons why they could not qualify as such. He pointed out that the alleged hedges against concurrent futures were really "spreads" or "straddles." [6] As to the alleged hedges against actuals, he testified that, in most instances, no risk position existed; for his analysis of the corporations' over-all long and short positions, at the time when such alleged hedges were entered into, revealed that petitioners had already acquired other futures which more than offset their alleged risk positions (in some instances, the offset was from 50 to 100 times the risk). He further testified that, in many instances, the alleged offsetting futures contract was in a commodity which had no normal price relationship to the actual (e. g., where an actual in coconut oil was purported to be offset by futures in lard— an animal substance produced in a different locality, processed and handled by different parties, and subject to different economic conditions). He stated that each of the alleged hedges suffered from one or more of the infirmities which he pointed out. The petitioners did not cross-examine him, either as to his opinion or as to his analysis of any of the transactions; and they presented no counter expert testimony.

As regards certain alleged hedges of futures in corn against concurrent futures in corn, there is still another infirmity. Section 502 (c) excludes from personal holding company income, only gains which arise out of bona fide hedging transactions of "a producer, processor, merchant or handler of the commodity." Neither petitioner even purported to be a producer, processor, merchant, or handler of corn.

We have analyzed all the evidence, including the stipulations, the testimony presented by petitioners, the exhibits, and also the testimony of the expert witness presented by the respondent. We feel impelled to hold that petitioners have failed to prove that any of the alleged hedging transactions were bona fide hedges, within the meaning of section 502 (c) ; and that all gains of each petitioner from futures transactions are includible in its personal holding company income.

---

[6] For an explanation of these terms, see Garside, Cotton Goes to Market (1935), p. 340; United States Department of Agriculture, Technical Bulletin No. 5747, January 1941. Examples of spreading or straddling are where one has taken opposite positions in identical futures in different markets (e. g., buying May wheat in Chicago, and selling May wheat in Winnipeg) ; and where one has taken different positions in the same market (e. g., buying March soybeans and selling November soybeans both in the Chicago market). Such spreading is undertaken with the expectation of closing out both positions at a profit, if the prices in the different markets, or of the different futures, thereafter move toward one another.

## IV.

Both petitioners have contended that, in applying section 502 (c) of the Code, the "portion of the gross income which consists of * * * gains from futures transactions," includes only the excess of gains over the losses from such transactions—or in other words, that the gains and losses from futures transactions must, in effect, be netted or offset against one another, so that only a *single composite gain* from transactions in commodity futures is includible in gross income and in personal holding company income. In support of this contention, petitioners point out that only a single "gross profit from sales" was determined with respect to their sales of actual commodities, in any year; and also that, in the schedule of capital gains and losses used in connection with their income tax returns, all capital gains and losses from their futures transactions were brought together in determining the "[t]otal net long-term capital gain or loss" and the "[t]otal net short-term capital gain or loss" taken into account on the returns.

We think that such contention is unsound; for it fails to take into consideration that the petitioners had two distinct classes or types of income, that each class bears a different tax burden, and that the method of computing gains and losses in respect of each class is different. One of these classes of income was that derived from the sale of *inventoriable property*, which was taxable as *ordinary income;* and, as to this, a single gross profit from sales was required to be determined by subtracting the aggregate cost of goods sold from the total sales. Regs. 111, sec. 29.22 (a) (5).

The other class of each petitioner's income was that derived from the sale of commodity futures contracts on boards of trade or commodity exchanges. These futures contracts (except where incident to bona fide hedging—which we have found was not the situation here) were *capital assets;* they were so regarded by the petitioners on their books, records, and returns; and they were likewise so regarded by the respondent. Such non-hedging futures contracts were not inventoriable property, stock in trade, or property held for sale to customers. And, as was pointed out by the Court in *Corn Products Co.*, 16 T. C. 395, one new futures contract may not be regarded as substantially identical with any other futures contract. This and other courts have held that, in determining gains or losses from sales or exchanges of capital assets, each asset must be treated separately; that gain or loss with respect to each must be computed with regard to its separate cost basis; and that the resulting capital gains are *includible in gross income*, whereas any resulting capital losses are *deductible from gross income* only to the extent provided by statute. *Lakeside Irrigation Co.*, 41 B. T. A. 892, affd. 128 F. 2d 418 (C. A. 5), certiorari denied

317 U. S. 666; *M. F. Reddington Co.* v. *Commissioner*, 131 F. 2d 1014, (C. A. 2), affirming a Memorandum Opinion of this Court; *Morris Investment Corporation*, 5 T. C. 582, affd. 156 F. 2d 748 (C. A. 3), certiorari denied 329 U. S. 788; *William F. Krahl*, 9 T. C. 862.

Gross income, as defined in section 22 of the 1939 Code, includes gains, profits, and income; whereas net income, as defined in section 21, means the gross income computed under section 22, less the deductions allowed by section 23. Losses from sales or exchanges of capital assets are *deductions from gross income* under section 23 (g).

The manner in which capital gains and losses are reported on income tax returns is not inconsistent with these principles. The schedule of capital gains and losses used in connection with returns provides a convenient method for bringing together the various gains, losses, and capital loss carryovers; and it facilitates the computation of the alternative tax. The resulting figures, termed "[t]otal net long-term capital gain or loss" and "[t]otal net short-term capital gain or loss" are, in themselves, statutory concepts which are defined in section 117 (a); and they are not to be confused with gross income, as defined in section 22.

As regards section 502 (c), it provides that personal holding company income includes, among other things, "the portion of the gross income which consists of * * * gains from futures transactions." It does not employ the term "gain" (in the singular), or "net gain," or "net income." If Congress had intended to mean "net gain," or had intended to include only the excess of gains over losses, it would have been easy to say so. Cf. *M. F. Reddington Co.* v. *Commissioner*, *supra*. We have found no statutory provision, legislative history, Treasury regulation, officially published ruling,[7] or decided case, which authorizes the netting or offsetting of capital losses against capital gains, in determining personal holding company income under section 502 of the 1939 Code. None of the cases cited by petitioners in their brief pertain to the determination of personal holding company income.

We have not overlooked the fact that Congress, in enacting the 1954 Code, inserted a new subsection, 543 (b), which provides:

(b) Limitation on Gross Income in Certain Transactions.—For purposes of this part—

\* \* \* \* \* \* \*

[7] A special unpublished ruling of the Bureau of Internal Revenue, dated March 4, 1942 (which may be found in 42–3 C. C. H. Federal Tax Reports par. 6236, and in 1942 P. H. Fed. par. 66, 148), stated, with regard to the interpretation of section 502 (b) of the 1939 Code:

aggregate gain from sale or exchange of stock or securities is to be included in gross income as defined in section five hundred two without adjustment or diminution on account of loss transactions.

We regard this unpublished ruling to amount to no more than an earlier expression of the position which respondent is taking in the instant case.

(2) gross income and personal holding company income determined with respect to transactions described in section 543 (a) (3) (relating to gains from commodity transactions) shall include only the excess of gains over losses from such transactions.

This limitation provision was not made retroactive; and no similar limitation provision is contained in the 1939 Code. It is one of a number of changes and amendments which were made with respect to the personal holding company provisions, "to relieve inequities and to provide for more effective administration of these provisions." [8] The House Ways and Means Committee, in commenting on said limitation provision, said:

Under present law [section 502 of the Internal Revenue Code of 1939], there is included in gross income and personal holding company income the gains from such transactions [stock and securities transactions and commodity futures transactions] without regard to losses occurring in similar transactions.[9]

The Senate Finance Committee, in its report, made no reference to the 1939 Code; but merely stated:

The second amendment to the definition of personal holding company made by the House and your committee makes it clear that gains from the sale of securities or commodities are not to be considered as gross income to the extent of the losses on such sales. Thus gross income and personal holding company income will reflect only the net gains from such transactions.[10]

The above comment of the House Ways and Means Committee concerning the 1939 Code does not have the same force as if it had been made by a committee of the Congress which enacted said Code. However, we agree with the conclusion expressed.

Finally, it should be observed that the classification of personal holding companies by reference to the character of their *gross income*, in no way deprives a corporate taxpayer of any deduction for losses from its futures transactions, which would otherwise be allowable; for such losses are considered in computing both the basic net income, and also the undistributed subchapter A net income upon which the special surtax is imposed. The purpose of such surtax was reviewed in *Morris Inv. Corporation* v. *Commissioner*, 134 F. 2d 774 (C. A. 3), certiorari denied 320 U. S. 743; and the validity thereof was upheld.

We hold, in conformity with the findings of fact which we have heretofore made, that each of the petitioners was a personal holding company within the meaning of sections 500 and 501 of the 1939 Code, during each of its fiscal years for which the respondent determined a deficiency in personal holding company surtax.

*Decisions will be entered under Rule 50.*

---

[8] H. Rept. No. 1337, 83d Cong., 2d Sess. (1954), p. 54.
[9] H. Rept. No. 1337, 83d Cong., 2d Sess. (1954), p. A176.
[10] S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), p. 74.