Edwin H. Miner, et al. * v. Commissioner. Miner v. Commissioner
Docket Nos. 82275, 82276, 82277.
United States Tax Court
T.C. Memo 1962-222; 1962 Tax Ct. Memo LEXIS 86; 21 T.C.M. (CCH) 1173; T.C.M. (RIA) 62222; September 19, 1962
*86 1. Expenses incurred in building up a herd of beef cattle with the hope that at some future time sales of cattle from the herd might produce a profit are not deductible under section 162(a) of the 1954 Code, as ordinary and necessary expenses of carrying on a trade or business for profit. 2. Issue raised for the first time on brief will not be considered. Henry W. Korade, Esq., for the petitioners. Hyman Maron, Esq., for the respondent. PIERCE Memorandum Findings of Fact and *87 Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioners, as follows: Dkt.
Calendar
Defi-
No.
Petitioner
Year
ciency
82276
Estate of Leona R. Miner,
Deceased, Edwin H. Min-
er, Executor, and Edwin
H. Miner, Surviving Hus-
band
1954
$333.06
82275
Edwin H. Miner
1955
398.99
82277
Edwin H. Miner and Clara
S. Miner
1956
499.34 The cases were consolidated for trial. The sole issue in the instant case relates to the deductibility of certain expenses incurred and paid in what the principal petitioner asserts was the operation of a business of "raising, buying and selling of beef cattle." Resolution of said issue turns upon whether the principal petitioner was actually engaged in such a business during each of the taxable years. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioners in Docket No. 82276, relating to the taxable year 1954, are Edwin H. Miner, individually, and Estate of Leona R. Miner, [1] Edwin H. Miner, executor. Said petitioners filed a joint *88 return for the calendar year 1954. Edwin H. Miner is the petitioner in Docket No. 82275, and he filed an individual return for the calendar year 1955. The petitioners in Docket No. 82277 are Edwin H. Miner and Clara S. Miner, husband and wife; and they filed a joint return for the calendar year 1956. Each of the aforementioned returns was filed with the district director of internal revenue at Albany, New York. The term "petitioner," as used hereinafter in the singular, will have reference to Edwin H. Miner. Petitioner, during the taxable years involved and for the greater part of his adult life, has been primarily an educator. However, he was raised on a farm; he has always had a fondness for farm life; and whenever possible during the course of pursuing his career as an educator, he has lived on a farm - and in so doing, he has satisfied both his own residential preference as well as that of his family. In 1947, shortly after his discharge from the Armed Forces following World War II, petitioner, who was at the time residing on *89 a farm in Vermont, accepted the position of an assistant commissioner of education in the United States Office of Education; and thereafter, until 1950, he did work of an educational character in the Office of the Secretary of Defense - in both of which positions petitioner was employed in the Washington, D.C. area. While so employed, petitioner and his family resided on a farm near the small town of Hamilton, in Loudoun County, Virginia, which is situated in an area famous for the raising of beef cattle, as well as show horses. Most of petitioner's friends and neighbors in Virginia were engaged in raising beef cattle; and he himself at one point considered purchasing a farm in the area and raising cattle thereon. In 1950, due to a reorganization in the Department of Defense, petitioner's job was eliminated; and in the summer of that year he was employed as dean of the Orange County Community College, at Middletown, New York. A year or so thereafter, petitioner was made president of the college, a position which he retained until the summer of 1959 (a period including all of the taxable years here involved), when he took a leave of absence in order to pursue a course of studies at *90 Columbia University leading to the degree of Doctor of Philosophy, which was awarded to him in 1960. Petitioner's salary as president of the college was $10,333.36 in 1954, $11,333.36 in 1955; and $12,333.28 in 1956. His second wife also was employed by the college and she received a salary of $5,390 in 1956. In May 1952, petitioner purchased a farm on the outskirts of Goshen, New York, which is about 8 or 10 miles from Middletown. The purchase price was $20,000, of which $5,000 was paid in cash as a down payment; the balance of the purchase price was secured by a mortgage. The farm contained 58 acres, about 40 of which were suitable for agricultural operations. The following buildings were situated on the farm: A 10-room dwelling house; a 6-room cottage; a garage with a 4-room apartment above it; a 3-story barn; a 2-story shop; and several other miscellaneous structures. It had been operated as a dairy farm in earlier years; but in the 5 years immediately preceding petitioner's occupancy it had not been farmed with regularity. As a consequence, the buildings and fences were in a state of disrepair; trees were down in the fields, and there was a great deal of undergrowth which *91 required cleaning up. At the time of purchasing the farm, petitioner's intent was for his family to live in the dwelling house; and they have done so continuously since the time of the acquisition of the farm. (None of the expenses, hereinafter mentioned which are involved in the instant case, were in any way connected with the residence portion of petitioner's farm.) Petitioner also believed that he would have to supplement his college salary if he were going to be able to make ends meet. Petitioner proposed to effect this supplementation by renting out the cottage and the apartment above the garage, and also by utilizing the 40 acres of agricultural land in some income-producing manner. Accordingly, he and his son undertook to repair and clean up the cottage and apartment forthwith; and these were in due course rented. During the years here involved, the gross rents and net income (or loss) from these properties were as follows: Gross
Net Income
Year
Rent
(or loss)
1954
$1,521.92
$457.54
1955
1,320.00
538.19
1956
1,245.00
(2.75) Neither the above-listed rentals, nor any of the expenses incurred with respect to the rental properties, are directly *92 involved in the instant case. In implementation of his plan to make money from his 40 acres of agricultural land, petitioner, after discussing the matter with his former neighbors in Virginia as well as persons in the Orange County area, decided that the breeding, raising, and selling of beef cattle would constitute the best use of the land. The particular breed of cattle that he decided to raise was the Hereford, a whitefaced, red coated, fairly heavy-boned beef animal. Petitioner was aware that he would require a herd aggregating 19 or 20 animals in order to break even, or perhaps to realize a small profit from beef-raising activities. Such a herd would be composed of 12 cows, 1 bull (these 13 animals making up the breeding animals of the herd), and 6 yearling steers. Petitioner believed that each cow would bear 1 calf per year, and that of these 12 calves, 6 would be bull calves and 6 would be heifers. Petitioner planned to sell the projected 6 yearling steers which would have been calved in the preceding year and were then on hand, and retain the projected bull calves; sell 5 of the 6 heifers as "vealers" shortly after their birth; and use the remaining newly born heifer to *93 replace the least desirable cow in his breeding stock, and to sell the cow so replaced. Based on the average market price for livestock prevailing in petitioner's area during the taxable years, petitioner expected to realize about $2,000 from the sale of 12 animals of the types just described. Petitioner had ample acreage to accommodate a herd of the desired size; and he could and did raise more than enough hay to feed the animals in such a projected herd. Also, petitioner could have, by using his other assets, have acquired the funds to purchase a breeding herd of the requisite size to start with, but he was unwilling to do so. Rather, he chose to start of with only 2 animals, intending to build up his herd by the natural increase that he hoped would occur through breeding of the cows. By use of the "natural increase" method of augmenting the herd, petitioner realized that it would require 7 or 8 years at the very least, before the 19-animal herd, the minimum size herd required for even a possibility of making any profit, could be built up. Sometime in 1952, petitioner purchased at an auction sale 2 cows, which had already been bred and were with calf, for about $300. Petitioner *94 did not at that time purchase a bull, his intention being to breed his cows by the artificial insemination method. However, petitioner was unable to purchase Hereford semen in his locality; and he therefore bought a bull in 1955 to service his cows. This bull and the 2 above-mentioned cows were the only animals that petitioner ever purchased. During the years 1953 through 1959 (including the years 1954 through 1956 here involved), petitioner's herd of cattle increase in size, as shown in the following table: No. in
Herd
Pur-
Dis-
at Be-
Raised
chased
posed of
ginning
During
During
During
Year
of Year
Year
Year
Year
1953
2
2
0
0
1954
4
0
0
1 *
1955
3
1
1
0
1956
5
4
0
0
1957
9
3
0
2 **
1958
10
3
0
2 *
1959
11
5
0
16
As shown in the above table, petitioner disposed of his entire 16-animal herd in 1959. He took this action *95 because at that time he was pursuing his doctoral studies on a fulltime basis in New York City; and he did not have the time to tend to the raising of his cattle. All the animals in petitioner's herd were of average quality; they were not so-called "prize stock." Petitioner and his son did most of the work entailed in raising the cattle on petitioner's farm. The only outside help utilized were two individuals: One was a high school boy who worked for petitioner one summer; and the other was a neighbor who, on a share-crop basis, cut and baled the hay on petitioner's farm and placed the same in the loft of petitioner's barn for storage. Petitioner himself devoted about 1 hour a day to activities (such as feeding and watering) connected with raising his cattle on the week days when he was primarily occupied with his duties as president of the college; and over the weekends he would devote 12 or more hours to such activities, and to such other activities as making improvements around the barn, clearing out the underbrush in the fields, and repairing fences. During the summer vacation months, while the college was closed, petitioner devoted a total of 48 to 50 hours to said activities. *96 Regarding the work performed by petitioner's son (who was of high school age), the lad devoted a little more time than his father during the school year; while during his summer vacation he worked about 9 weeks. Petitioner purchased the following machinery and equipment, and made the following addition to his barn, in the years indicated: Year
Cost
1952
Jeep and plow
$1,295.00
1953
Tractor and mower
1,050.00
1954
Mower
100.00
1955
Post hole digger
138.33
1056
Addition to barn
195.12
During each of the 3 taxable years involved, petitioner attached to the Federal income tax return which he filed, a schedule on Form 1040F (Schedule of Farm Income and Expenses). The only item of income which he reported on these schedules during this 3-year period was $25 from the sale of hay for the year 1954. The expenses deducted on said schedules, and the resultant losses (which petitioner deducted from his salary, rents, and other income on his return) were as follows: Item of expense
1954
1955
1956
Repairs & mainte-
nance
$ 728.13
$ 801.82
$ 804.12
Taxes
72.08
154.05
178.10
Insurance
26.25
194.44
202.24
Interest
243.80
231.20
217.48
Storm damage
50.00
Depreciation
667.83
667.83
658.09
Total Expenses
$1,788.08
$2,049.34
$2,060.03
Less: Reported in-
come
25.00
None
None
Net Loss
$1,763.08
$2,049.34
$2,060.03
*97 Petitioner's expenses would not have been any greater even if he had had on hand the entire 19 animals which his farm could have accommodated and which he knew he had to have in order to break even or make a small profit. The respondent, in his statutory notices of deficiency, determined that the abovelisted deductions for repairs and maintenance, insurance, and depreciation were not allowable "for the reason that they were not incurred in a trade or business or in a transaction entered into for profit." Respondent allowed the remaining items (for taxes, interest and storm damage) as itemized nonbusiness deductions. Petitioner, in his petitions herein, has alleged only that he was engaged in a trade or business of "raising, buying and selling of beef cattle." Said petitions do not contain any allegation that the expenses (whose deduction gave rise to the losses claimed on petitioner's returns) were paid or incurred for the collection of income, or for the management, conservation, or maintenance of property held for the production of income. Ultimate Finding of Fact Petitioner was not engaged, during any of the taxable years involved, in a trade or business of breeding or *98 buying, raising, and selling beef cattle. Opinion The issue framed by the pleadings in the instant case is whether those expenses claimed on petitioners' returns which the respondent disallowed were ordinary and necessary expenses of a trade or business, deductible under section 162(a) of the 1954 Code. The precise wording of each of the petitions is: "The various expenses incurred in the business of raising, buying and selling of beef cattle were ordinary and necessary business expenses." We shall first dispose of the issue so raised by the pleadings; and then we shall take up an issue raised for the first time by petitioners in their reply brief, viz., that the disputed items are deductible as nontrade or nonbusiness expenses, either "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income," as those phrases are used in subsections (1) and (2), respectively, of section 212 of the 1954 Code. 1. There is no dispute that petitioner actually expended the amounts here involved and that his equipment sustained the depreciation which he claimed thereon; and the respondent conceded at the trial that *99 the expenditures and depreciation bore a proximate relationship to petitioner's beefraising activities. The question therefore narrows down to this: Did petitioner's activities constitute the carrying on by him of a trade or business for profit during the taxable years here involved, 1954, 1955, and 1956? Such a question is factual. The ultimate finding of fact which we have hereinabove made, answers and disposes of this question in the negative, adversely to petitioner's contentions. Before a taxpayer can be said to be engaged in a trade or business, we believe that at least two conditions must be present: (1) He must have the motive and intention of realizing a profit; and (2) his activities must be of that type or character which will constitute the present carrying on of a business, rather than activities of preparing to enter and carry on business at some future time. With respect to the necessity of a profit motive, we said in Henry P. White, 23 T.C. 90, 93-94, affd. (C.A. 6) 227 F. 2d 779: Whether the amounts presently in controversy are claimed as "losses" or as ordinary and necessary business expenses, the existence of a profit motive on the *100 part of petitioner is requisite. [n1] The principle which we are now required to apply has been aptly stated by Judge Learned Hand sitting as a District Judge in Thacher v. Lowe, (S.D.,N.Y.) 288 F. 994, 995: "It does seem to me that if a man does not expect to make any gain or profit * * * it cannot be said to be a business for profit, and while I should be the last to say that the making of a profit was not in itself a pleasure, I hope I should also be one of those to agree there were other pleasures than making a profit. * * * it does make a difference whether the occupation which gives him pleasure can honestly be said to be carried on for profit. Unless you can find that element it is not within the statute, * * *" [Footnote omitted.] One clear and unmistakable conclusion that leaps from the record in the instant case is that petitioner could not, and was fully aware that he could not, conceivably have realized a profit from those beef-raising activities in which he was actually engaged. Nor could he have had even an expectation of a profit for at least 3 years after the last of the taxable years here involved, for it would have been 1959, at the earliest, before *101 he could have built his herd up to 19 animals - the minimum number required if he were to be able to sell his planned number of animals per year. And even then, it was by no means certain that the projected sales would have yielded a profit to petitioner; for he himself testified, with admirable candor: "[So] at the end of * * * [a] year, I would be back to nineteen and if I could keep the circle going normally at nineteen I figured I could break even, and perhaps make a little money, depending upon the quality of the market." [Italics supplied.] In our view, the most that can be said of petitioner's beef-raising activities during the taxable years here involved (as well as before and after then) is, that he was endeavoring to build up a herd of animals which would enable him to engage in a cattle business, that might prove profitable at some future time. The expenses incident to such a herd build-up were, accordingly, of a capital nature, and hence not currently deductible. They were analogous to the amassing of the capital assets such as the plant and machinery of a manufacturing business, preparatory to the actual beginning of business operations. See and compare George C. Westervelt, 8 T.C. 1248, *102 wherein we disallowed the expenses of a taxpayer (who was actually in the shipyard construction business, but who also was interested in getting into the cattle raising business), which he had incurred in traveling about the country collecting data, investigating cattle-raising methods, and acquiring the bulls for a foundation herd which he subsequently did acquire. See also Robert J. Wallendal, 31 T.C. 1249, 1251, and the cases there cited, wherein we held that expenses of preparing to enter a business do not qualify for deduction as the ordinary and necessary expenses of carrying on a business. After considering and weighing all the evidence herein, we hold in accordance with our ultimate finding of fact, that petitioner was not engaged during any of the taxable years here involved, in a trade or business of breeding or buying, raising, and selling beef cattle. Accordingly, we further hold that the expenses and depreciation disallowed by the respondent are not deductible as ordinary and necessary business expenses under section 162(a)(1) of the 1954 Code. 2. Turning to petitioners' contention that the expenses are deductible as nontrade or nonbusiness expenses under *103 section 212 of the 1954 Code, it must be pointed out once again that this contention was not raised in the petitions; was not mentioned or raised by petitioners' counsel in his opening statement at the trial; and was not raised by petitioners in their principal brief. Rather it was raised for the first time in petitioners' reply brief. Petitioners have not sought to amend their petitions to raise such an issue or to conform the pleadings to the proof. This Court has held repeatedly that it will not consider issues raised for the first time on brief. Irving Segall, 30 T.C. 734; Sicanoff Vegetable Oil Corporation, 27 T.C. 1056, 1066; F. H. Philbrick, 27 T.C. 346, 353; see also Rule 7(c)(4)(B)4, Tax Court Rules of Practice. In the light of these authorities, it would be inappropriate, and entirely nonconsonant with an orderly judicial practice, to consider this belatedly raised issue. We accordingly make no decision on the issue. However, we will say that, even if the issue were properly before us, we would be of the opinion that petitioners could not prevail. Nontrade or non-business expenses, which are of a capital nature, are not deductible. *104 See Robert L. Wilson, 37 T.C. 230; Byron H. Farwell, 35 T.C. 454. We have pointed out above that the expenses here involved were of a capital nature. Decisions will be entered for the respondent. Footnotes
*. The following cases are consolidated herewith: Estate of Leona R. Miner, Deceased, Edwin H. Miner, Executor, and Edwin H. Miner, Surviving Husband, Docket No. 82276: and Edwin H. Miner and Clara S. Miner, Docket No. 82277.↩
1. Leona R. Miner, the first wife of petitioner Edwin H. Miner, died in 1954. Said petitioner married his present wife, Clara S. Miner, in 1956.↩
*. The animals shown as disposed of during 1954 and 1958 were calves which were slaughtered by petitioner and used as food for his family. ↩
**. The 2 animals disposed of in 1957 were 1 heifer and 1 bull (being the same bull purchased in 1955, which proved to be unmanageable).↩