**SICANOFF VEGETABLE OIL CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**SICANOFF TALLOW CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 12095, 12096.**

United States Court of Appeals
Seventh Circuit.

Jan. 29, 1958.

John W. Hughes, Harold R. Burnstein, John E. Hughes, Chicago, Ill., for petitioners.

Charles K. Rice, Asst. Atty. Gen., I. Henry Kutz, Lee A. Jackson, James P. Turner, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and FINNEGAN and HASTINGS, Circuit Judges.

HASTINGS, Circuit Judge.

Petitioners, Sicanoff Vegetable Oil Corporation and Sicanoff Tallow Corporation, appeal from a decision of the Tax Court of the United States which sustained the Commissioner of Internal Revenue's determination that 80% of their gross income for 1950 consisted of gains from futures transactions in commodities subject to the rules of a board of trade or commodity exchange, none of which gains resulted from bona fide hedging transactions reasonably necessary in the conduct of their business, and that, therefore, both were personal holding companies as defined by the Internal Revenue Code of 1939, 26 U.S. C.A. § 500 et seq. (I.R.C.1939), (hereinafter referred to as the 1939 Code). The Sicanoff Vegetable Oil Corporation was additionally found to have had such gains from commodity futures transactions amounting to over 70% of its gross income for the years 1951 and 1952 and was held to be a personal holding company in those years. Deficiencies totaling $1,094,384.35 were assessed against the two corporations. The cases were consolidated for trial and for review by this court, and the only issue raised on appeal is whether or not the Tax Court erred in considering only the futures transactions of petitioners which resulted in gains in determining petitioners' gross income and in computing the percentage of the gross income which could be termed personal holding company income.

The facts indicate that Sicanoff Vegetable Oil Corporation was an Indiana corporation with offices in Indianapolis. Its books were maintained on an accrual method of accounting and on the basis of a fiscal year ending the last day of February. Its entire outstanding stock was owned by not more than four individuals. The corporation engaged in the buying and selling of soybean and cocoanut oil (actual transactions), and also dealt extensively in futures transactions in commodities on, or subject to, the rules of boards of trade or commodity exchanges, and for the most part on the Chicago Board of Trade. The dealings in "actuals", (purchases and sales of soybean oil and crude cocoanut oil), were

handled through a broker and were directly between the corporation and various other domestic corporations. The oils were generally bought and sold in carload lots, sometimes with provision for immediate delivery but mostly for future delivery of from one to six months. The oils so purchased and sold were subject to market fluctuations in price. Any profit realized by the Vegetable Oil Corporation was by taking advantage of such fluctuations. The futures transactions were similarly handled through a broker and included both "long" and "short" transactions in a wide variety of commodities. The corporation did not make or accept delivery of any commodity covered by such futures contracts but, in each case, prior to specified delivery date, it offset each futures contract by another long or short futures contract obtained through the same broker. The broker would issue a statement at the end of each month indicating the condition of the corporation's account and specifying the extent of its long and short positions for the various commodities. The results of both operations of the corporation are summarized in the Tax Court's findings of fact.

The other taxpayer, Sicanoff Tallow Corporation, was similarly an Indiana corporation with offices in Indianapolis. It was controlled and operated by substantially the same persons. Its books and records were kept on an accrual method on the basis of its fiscal year ending July 31. This corporation's business was much like that of the other taxpayer except that it dealt in tallow and edible grease rather than vegetable oils. It also engaged extensively in futures transactions in commodities on, or subject to, rules of a board of trade or commodity exchange. Neither petitioner questions the Tax Court's finding that none of the gains from futures transactions by either corporation for any of the fiscal years involved arose out of bona fide hedging transactions within the meaning of § 502(c) of the 1939 Code.

At the outset it would be well to indicate that the surtax imposed upon a personal holding company is made upon the undistributed subchapter A net income after certain deductions, including deductions for losses from sales of capital assets, are allowed. The section we are dealing with merely defines personal holding company income and sets up requirements for classification of a given corporation as a personal holding company.

The language of the 1939 Internal Revenue Code brought in question here is that part of § 502 which defines personal holding income as *"the portion of the gross income which consists of * * * [g]ains from futures transactions * * *."* The respondent's contention is that only futures transactions resulting in gains are a part of gross income and that only such transactions are to be considered in determining whether 80% of the taxpayer corporation's gross income is personal holding company income. The petitioners claim the statute requires a netting or offsetting of those futures transactions resulting in gain and those resulting in loss with the inclusion of the single composite gain in gross income. There are no decided cases in point. The precise question may never recur since Congress in enacting the 1954 Internal Revenue Code added a section at this point specifically providing that *gross income would include only the excess of gains over losses from futures transactions,* see 26 U.S.C.A. § 543b(2) (I.R.C.1954). It is petitioners' position that this act of Congress amounted to a clarification of existing law. The respondent, on the other hand, urges that the section's meaning was already clear and unambiguous and that the 1954 Code provision definitely effected a change which was not made retroactive.

It is respondent's position that the general statutory scheme of the Revenue Code supports his view. The gains and losses from transactions in commodity futures which are not true hedges are

treated as arising from the sale of capital assets, Faroll v. Jarecki, 7 Cir., 1956, 231 F.2d 281, 282. Section 507 of the 1939 Code provides that terms used in subchapter A dealing with personal holding companies shall have the same meaning as those terms when they are used in chapter one of the Code dealing generally with corporate and individual income tax. The respondent contends that a reference to chapter one indicates clearly that the overall statutory plan of the 1939 Code calls for the inclusion of all "gains" in gross income (§ 22(a) 26 U.S.C.A. § 22(a)) and the deduction of all losses from gross income (§ 23(g) 26 U.S.C.A. § 23(g)) in arriving at net income (defined in § 21(a), 26 U.S.C.A. § 21(a)). Further, respondent contends, it is obvious from usage throughout chapter one that the term "gains" in itself does not mean a netting of gains and losses. He points out that in § 117(d) (1) (as amended by § 150(b), Revenue Act of 1942, Ch. 619, 56 Stat. 798), 26 U.S.C.A. § 117(d) (1) the term "gains" is used as distinguished from "losses" where the Code provides that: "In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges." The same section provides in addition that, in the case of a corporation, the excess of gains from sales or exchanges of capital assets over the losses from such sales or exchanges is "net capital gain." (Section 117(a) (10) (A) as added by § 150(a) (6), Revenue Act of 1942, supra). Respondent urges and the Tax Court found that the term "gains" would not be used by Congress to refer to the concept of "net capital gain" as contended by petitioner and that if Congress had meant "net capital gain" it would have said just that. Finally, respondent points out that § 111(a) of the 1939 Code, 26 U.S.C.A. § 111(a) obviously envisioned a separate computation of gain or loss from each sale of an asset as a preliminary to the addition of gains to gross income and subsequent deduction of losses.

Respondent's outline of the Code structure as it bears on the language to be construed in this case is correct as far as it goes. The question arises, however, whether the statutory definition of "gross income" is as narrow and fixed as he would have it. Petitioners make reference to several specific instances in which a "special" meaning was imparted to the concept of gross income. In the case of United States v. Benedict, 1950, 338 U.S. 692, 70 S.Ct. 472, 94 L. Ed. 478, for example, the Supreme Court held that only 50% of the long term gain of a certain trust should be added to gross income. The trustees in that case had permanently set aside a charitable contribution to be made from the proceeds of the trust estate's long term capital gains. The issue was whether in computing a deduction from gross income the entire amount of capital gains should be included or merely 50%. The problem arose since § 117(b) of the 1939 Code provided that only 50% of the long term gains or losses from sales would be recognized in computing net capital gain. The decision of the Court was intended to give effect to the provisions of § 117(b) and, as the respondent points out, that special section is inapplicable to corporations. However, the case does point out the ambiguity and lack of clarity inherent in the Revenue Code's general provisions. As Mr. Justice Frankfurter, in a separate opinion, stated: "The contrariety of views expressed by the Tax Court, the Court of Appeals for the Second Circuit, the Court of Claims and now by this Court in the task of harmonizing §§ 22(a), 117(b) and 162(a) of the Internal Revenue Code * * * conclusively proves the opaqueness, if not inherent incongruity of those provisions." Id. 338 U.S. at page 699, 70 S.Ct. at page 476.

Petitioner also relies on the case of Woodside Acres, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1943, 134 F. 2d 793. The issue there, analogous to the one in the instant case, was whether or not a corporation engaged in farming operations, but which also received a

large part of its income from dividends, interest and rents, was a personal holding company. In order to avoid the classification as a personal holding company, the taxpayer had to establish that 20% of its "gross income" was from the farm operation. The taxpayer did not deduct expenses of operation of the farm in computing his gross income from farming and, so computed, his gross income from farming was more than 20% of his total gross income. The Commissioner contended that operating expenses were to be subtracted from gross receipts in arriving at gross income; and the court accepted this, rejecting petitioner's reliance on Section 23 of the 1936 Act and regulations interpreting it. The court stated, at page 794, that there could be no doubt that "all the usual and necessary expenses of operating the dairy farm are deductible in computing net taxable income under § 23 of the Revenue Act of 1936 * * *." Then the court proceeded to accept the Commissioner's position that when taxation of personal holding companies is involved the provisions of Section 23 did not apply in spite of the reference in Title 1A (comparable to subchapter A dealing with personal holding company in the instant case) that the meaning of terms used in that Title should be the same as the meaning of the terms in Title I (Chapter one of our case). The court stated significantly enough: " * * [G]ross income so determined for that purpose [purposes of computing tax under Title I] did not become an immutable factor in determining whether a corporation which ran a farm was also a personal holding company." Id. at page 795. In the more recent case of McCulley v. Kelm, D.C.D.Minn., 4th Div.1953, 112 F.Supp. 832, the Bureau of Internal Revenue relied on the Woodside holding in contending that operating expenses were to be subtracted in arriving at gross income for the purposes of determining whether a taxpayer had misstated his gross income more than 25% of its total (thus extending a three year statute of

limitations against assessing deficiencies to five years). The court pointed out at page 836: "[T]he Government seems to argue that section 275(c) means something different when it uses the term 'gross income.'" It was decided that the Woodside decision did not support the Bureau in the McCulley case because in Woodside the question was one of the meaning of gross income for purposes of the personal holding company provisions.

In Garrett Holding Corp. v. Commissioner of Internal Revenue, 1947, 9 T.C. 1029, 1034, which involved a situation similar to that in the Woodside case the Tax Court in following Woodside stated:

"The petitioner contends that in determining its gross income under section 501(a) (1) the costs of its farm production should not be subtracted from its gross receipts; in short, that gross income means gross receipts. Such procedure appears to be followed in reporting the gross income of farmers for income tax purposes, whether on a cash or accrual basis. See section 29.22(a)–7 of Regulations 111. The petitioner argues that the same procedure should be applied in determining the gross income of farmers for personal holding purposes. Its argument was fully discussed and rejected in Woodside Acres, Inc., 46 B.T.A. 1124, [affirmed 2 Cir.], 134 Fed (2d) 793. There we deducted the costs of production from the gross sales of dairy products *in determining gross income for personal holding company purposes*." (Emphasis added.)

The court in the Woodside case very aptly pointed out that, generally, it matters very little whether a taxpayer treats certain allowable deductions as a deduction *from* gross income in arriving at net income or as an amount to be subtracted from gross receipts. For that reason it refused to consider as controlling sections of the Code and applicable regulations ordinarily followed in the compu-

tation of farm income for tax purposes, but looked instead to a particular ruling by the Bureau as to what constituted gross income for holding company purposes. In the instant case, although, necessarily, under Section 507 of the 1939 Code, a reference must be made to chapter one for a guide in the application of the personal holding company provisions, this court feels there is inherent ambiguity in the words "gains from futures transactions" which cannot be brushed aside by a statement that if Congress had meant to say "gain" rather than "gains", it would have done so. Further, the sections of the Code in chapter one relating to gross income and providing for deductions are not conclusive as to the meaning of the term "gross income" in Section 502. Section 22(n), defines what is termed "adjusted gross income" as gross income minus, among other things, losses from sales or exchanges of capital assets and operating expenses of a taxpayer's business. The United States Corporation Tax Return form provides for such "adjustment" of gross income before "deductions" are taken. This adjustment is made by a corporation on separate schedules by computing short and long term capital gains and losses. The losses are then subtracted from gains (only to the extent of gains, of course). Such an adjustment of gross income in the determination of the amount of personal holding company income of a corporation could have been intended by the Congress when it enacted the 1939 Code; it is certainly clear that that is the effect of the 1954 amendment.

The wording of Section 502 in the 1939 Code was not changed by Congress. The 1954 Code instead added a section, supra, stating, in effect that losses and gains are to be netted. The Tax Court opinion refers to a special unpublished ruling of the Bureau of Internal Revenue dated March 4, 1942 which stated with regard to the interpretation of § 502(b): "[A]ggregate gain from sale or exchange of stock or securities is to be included in gross income as defined in section five hundred two without adjustment or diminution on account of loss transactions." 1957, 27 T.C. 1056, 1072. That court aptly points out that the unpublished ruling amounts to no more than an earlier expression of Commissioner's view on this section's meaning. Nor can much weight be given to the views of text writers on the meaning or effect of the law prior to 1954. The House Ways and Means Committee and the Senate Finance Committee both commented on the amendment involved. The Ways and Means Committee report contained a statement that "[u]nder present law there is included in gross income and personal holding income the gains from such transactions without regard to losses occurring in similar transactions." [1] The Senate Finance Committee report merely stated: "The second amendment to the definition of personal holding company made by the House and your committee *makes it clear* that gains from the sales of securities or commodities are not to be considered as gross income to the extent of losses on such sales." [2] (Our emphasis.) Neither committee had any authority upon which to base their understanding of the existing law. One report terms the amendment a "change" and the other a "clarification."

After enactment of the 1954 Code, the Joint Committee on Internal Revenue Taxation, published and issued a booklet entitled "Summary of the New Provisions of the Internal Revenue Code of 1954," which, at page 75, characterized the amendment as one of clarification in the following words:

"A second amendment to the definition of personal holding company income *makes it clear* that gains from the sale of securities or commodities are not to be considered as gross income to the extent of losses

---

1. H.Rept. No. 1337, 83rd Cong., 2d Sess. (1954), p. A176.

2. S.Rept. No. 1622, 83rd Cong., 2d Sess. (1954), p. 74.

on such sales." (Emphasis supplied.)

In construing the language of Section 502 here involved, we have considered it within the framework of the applicable Revenue Code's provisions. We also looked to the legislative history of the provision limiting the section to be construed, and we have noted that the precise question raised in this case has never been passed upon by any court; and that the Commissioner can cite no general administrative policy or ruling applicable thereto, except the special unpublished ruling of the Bureau dated March 2, 1942, *supra*. Finally to be considered is the Congressional purpose behind enactment of the personal holding company provisions. This purpose has been defined as one of preventing the use of the "incorporated pocketbook" to accumulate income and thus avoid individual surtax rates. No proof of shareholders' intent to avoid income taxes is necessary if the corporation comes within the definition of a personal holding company. "The rates were avowedly 'pressure' rates, intended not so much to produce revenue as to cause an abandonment of the use of personal holding companies by compelling them to distribute their total income, to abandon the characteristics which made them holding companies, or to dissolve." Mertens, Law of Federal Income Taxation, Vol. 7, § 40.03 (1956). In Pembroke Realty & Securities Corp. v. Commissioner, 2 Cir., 1941, 122 F.2d 252, 253, that court indicated: "The [personal holding company] legislation was enacted for the purpose of inducing personal holding companies to distribute current income by laying a penal surtax upon income which they retained." See also Knight Newspapers v. Commissioner, 6 Cir., 1944, 143 F.2d 1007, 1010, 154 A.L.R. 1267. The personal holding company surtax is generally acknowledged to be a penalty imposed on these corporations coming *clearly* within the definitive language of Congress.

In the instant case, as a result of respondent's interpretation of the provision involved, Sicanoff Vegetable Oil Corporation is classified a personal holding company in a tax year ending February 28, 1950, when it had gains from futures transactions in the amount of $234,172.96 and losses of $273,790.52. Thus, there was no "personal holding company income" to distribute in that year. The losses are allowed to be deducted, of course, in the assessment of the surtax on the undistributed subchapter A net income of the corporation but only to the extent of gains. The surtax is imposed, therefore, on the total income of the corporation from "actuals" transactions, no part of which income comes within the definition of "personal holding company income." Congress surely did not intend this result.

It is our conclusion that the purpose of the 1954 amendment, permitting an "adjustment" of gross income by allowing a netting of gains and losses from commodities futures transactions, was to clarify existing law rather than make new law.

We hold that the Tax Court erred in adjudging each of the petitioners to be a personal holding company within the meaning of Sections 500 and 501 of the 1939 Code during each of the fiscal years for which a deficiency in personal holding company surtax was determined.

The judgment is reversed, with directions to proceed in accord with this opinion.

FINNEGAN, Circuit Judge (concurring).

This separate opinion serves as a reservation of my views concerning those provisions of the Internal Revenue Code of 1954 mentioned in Judge HASTINGS' opinion. My brothers reached a result under the Internal Revenue Code of 1939 which I approve.