William L. Carpenter and Helen W. Carpenter v. Commissioner.
Carpenter v. Commissioner
Docket No. 1714-64.
United States Tax Court
T.C. Memo 1966-188; 1966 Tax Ct. Memo LEXIS 96; 25 T.C.M. (CCH) 965; T.C.M. (RIA) 66188; August 11, 1966
William L. Carpenter, pro se, Rockport, Mo. Edward E. Pigg, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined income tax deficiencies of the petitioners as follows: Year
Amount
1958
$ 91.02
1959
509.04
1960
133.84
1961
5,128.52
As a result of concessions the only issues remaining before the Court are whether deductions of $5,516.12 *97 and $22,205.50 claimed by petitioners for the respective taxable years 1959 and 1961 constitute ordinary and necessary business expenses arising from hedging transactions related to petitioners' farming business or were capital transactions and subject to the limitations upon capital losses. Findings of Fact Some of the facts have been stipulated and are so found. Petitioners William L. Carpenter and Helen W. Carpenter were husband and wife residing at Rockport, Missouri, during the years in issue and they filed their calendar year cash basis Federal income tax returns for such years with the district director of internal revenue, Kansas City, Missouri. Helen W. Carpenter is a party solely by reason of having filed joint returns with her husband, consequently he will be referred to herein as petitioner. Petitioner has been continuously engaged in farming since 1933 and in 1959 and 1961 he owned and operated farms having acreages of farm crop land as follows: Farm
Grain Crop Land
Nodaway County, Missouri
(#M-46)
100 acres
Nodaway County, Missouri
(#K-335)
786.34 acres
Nodaway County, Missouri
(#L-1108)
455.8 acres
Atchison County, Missouri
(#G-35)
33.6 acres
Total (rounded)
1,376 acres
*98 During the years in issue petitioner operated the above farms on a 50-50 cropsharing arrangement with tenants except for Nodaway County farm #L-1108 which he operated solely for his own account in 1959. The acreages of the farms were devoted equally to the crops of corn and soybeans in 1959 and 1961. [1]
Petitioner kept no records showing his production either by acres, bushels, or dollar amounts of corn or soybeans or of grain on hand at any particular time, however, it is stipulated that his total sales of grain crops amounted to $28,044.76 in 1959 and $37,193.76 in 1961. During the year 1961 approximately 20 percent of petitioner's grain crop land was withdrawn from production and placed in the soil bank, consequently the total of 1,376 acres of grain crop land were reduced to 1101 acres for such year. Petitioner estimates that his grain crop land produced about 45 bushels per acre of soybeans in 1959 and 1961 and 100 bushels *99 per acre of corn for such years. Such estimates are approximately double the yields per acre of land in Nodaway and Atchison counties according to reports of the State Department of Agriculture. Petitioner's production was not more than the following amounts: Corn
Soybeans
1959
45,800 bushels
20,610 bushels
1961
27,500 bushels
12,375 bushels
In 1959 and 1961 petitioner planted his corn in May and the crop was harvested in October and November. He planted his soybeans in June and the crop was harvested in September, October and November. For many years, and during 1959 and 1961, petitioner maintained and used a commodities account with B. C. Christopher & Company, a Kansas City, Missouri, commodity broker. Petitioner maintained this account in the name of Carpenter Seed Co., designated it as a "hedge" account, and was thus able to trade on less (longer) margins. Analysis of petitioner's trading account for the year 1959 shows the following: Quan-
Net
tity
Con-
Position
(Thous.
tract
Gain or
(Thous.
Date
bu.)
Month *
(Loss)
bu.)
Soybeans
2-27
10
Mar.
($ 161.00)
Unknown
7-21
10
Nov.
10 Short
7-29
10
Nov.
170.25
0
$ 9.25
Corn
4-20
20
Dec.
20 Long
5-29
10
July
30 Long
6-5
10
July
40 Long
7-21
20
July
$ 40.50
20 Long
7-21
30
Sept.
50 Long
8-3
30
Sept.
85.75
20 Long
8-3
20
Dec.
(522.00)
0
($ 395.75)
Rye futures transactions
(Net loss)
($ 4,736.75)
Wheat futures transactions
(Net loss)
(392.87)
Total Net Loss
($ 5,516.12)
*100 Analysis of petitioner's trading account for the year 1961 shows the following: Quan-
Net
tity
Con-
Position
(Thous.
tract
Gain or
(Thous.
Date
bu.)
Month **
(Loss)
bu.)
Soybeans
1-1
Open Position
20 Short
1-3
10
July
30 Short
1-4
30
July
[758.00)
0
1-16
25
Nov.
25 Short
1-17
20
July
(472.00) *
1-18
30
July
55 Short
1-19
55
July
1,402.00
0
1-24
10
July
10 Short
1-25
10
July
(786.00)
0
1-25
30
July
30 Short
1-26
20
July
(772.00)
10 Short
1-27
10
July
(1,036.00)
0
2-3
10
July
10 Long
2-6
10
July
20 Long
2-7
20
July
(1,022.00)
0
2-7
20
July
20 Short
2-8
10
July
30 Short
2-9
10
July
(986.00)
20 Short
2-9
10
July
30 Short
2-10
10
July
(786.00)
20 Short
2-10
10
July
30 Short
2-13
10
July
40 Short
2-16
10
July
50 Short
2-27
50
July
(14,505.00)
0
3-8
20
July
20 Short
3-9
20
July
40 Short
3-10
20
July
60 Short
3-14
20
July
80 Short
3-14
80
July
2,003.50
0
3-15
45
July
45 Short
3-16
45
July
(366.00)
0
3-16
50
July
50 Short
3-16
25
Nov.
75 Short
3-17
10
July
85 Short
3-17
20
Nov.
105 Short
3-22
85
July
(2,533.00)
20 Short
3-24
20
Nov.
(646.00)
0
3-24
10
July
10 Long
3-27
10
July
(423.00)
0
3-27
30
July
30 Short
3-28
20
July
50 Short
3-29
25
July
75 Short
3-29
75
July
2,902.50
0
3-30
30
July
30 Short
4-3
20
July
50 Short
4-3
25
July
(757.50)
25 Short
4-4
25
July
50 Short
4-5
25
July
(620.00) *
50 Short
4-5
50
July
(2,177.50)
0
4-26
10
Nov.
10 Short
5-4
10
Nov.
114.50
0
($22,223.50)
Corn
1-20
10
Mar.
10 Short
1-26
10
Mar.
($ 136.00)
0
10 Dec. &
2-6
20
10 July
20 Long
10 Dec. &
(278.25)
2-7
20
10 July
0
20 Dec. &
2-7
30
10 Mar.
30 Short
2-8
10
Dec.
40 Short
2-9
30
Dec.
(233.00)
10 Short
2-10
10
Mar.
126.50
0
3-10
20
May
20 Short
3-17
20
May
112.00
0
3-27
20
May
20 Short
3-29
20
May
40 Short
3-29
40
May
1,449.00
0
4-3
10
May
6.00 *
0
4-4
10
May
10 Short
4-5
10
May
(81.50)
0
4-25
10
May
10 Short
4-28
10
May
106.00
0
$ 1,070.75
Rye futures transactions
(net profit)
1,069.50
Oats futures transactions
(net loss)
(1,393.50)
Soybean meal futures
transactions (net loss)
(1,035.00)
Wheat futures transactions
(net loss)
(108.75)
Total net loss
($24,713.00)
*101 Petitioner's 1959 income tax return showed a loss item of $5,516.12, labeled B. C. Christopher Hedge Account which item was used to reduce farm income. Statutory deficiency notice disallowed such claimed loss "since it is held not to qualify as a hedging loss and was in fact speculation and loss is allowed below as a short-term capital loss." Petitioner's 1961 income tax return showed a loss item of $22,205.50 designated "Hedge Account Loss-Grain" and used it to reduce farm income. The statutory deficiency notice disallowed such claimed loss "since it is held not qualified as a hedging loss and was in fact speculation and loss is allowed as a short-term capital loss." The above losses of $5,516.12 and $22,205.50 sustained by petitioner from commodity market transactions in 1959 and 1961 were capital losses and not ordinary business losses from hedging. Opinion It is petitioner's position that the losses of $5,516.12 in 1959 and $22,205.50 in 1961 were deductible as ordinary business losses *102 since they had arisen out of hedging transactions. Respondent contends that under section 1233 of the Internal Revenue Code of 1954[1] they are to be considered as losses from the sales of capital assets and thus subject to the limitations imposed upon such losses. Section 1233, supra, provides in pertinent part: (a) Capital Assets. - For purposes of this subtitle, gain or loss from the short sale of property, shall be considered as gain or loss from the sale or exchange of a capital asset * * *
(g) Hedging Transactions. - This section shall not apply in the case of a hedging transaction in commodity futures. Pertinent regulations define hedging transactions and commodity futures. [2]
*103 The question whether or not a given course of action constitutes hedging has been considered by the courts in many cases involving almost every conceivable factual situation. Without exception the adjudicated cases indicate that the question is a factual one to be answered in each case upon the peculiar fact presented. See, e.g., Kenneth S. Battelle, 47 B.T.A. 117. The more enlightening definitions of hedges and hedging transactions include the following: A hedge, on the other hand, is not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself, as in the case of a speculative or capital transaction, but is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed or, as in the case of a producer such as a cotton grower, will become fixed in normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future. * * * [L. M. Muldrow, 38 T.C. 907, 913]
Generally, where a hedge is made, a position is taken in the futures market to offset a risk with respect to actuals. The purchase *104 or sale of a futures contract to offset the risk of holding another futures contract does not ordinarily qualify as a bona fide hedge - for such risk is a speculative one, and is not attached to the holding of a commodity expected to be used or marketed in a business. The authorities indicate that, in order to have a bona fide hedge, there must be: (1) A risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk. [Sicanoff Vegetable Oil Corporation, 27 T.C. 1056, 1067-8, reversed on other issues 251 F. 2d 764]
A dealer with stocks of a particular commodity on hand runs the risk of loss should the market price of the commodity fall. To minimize that risk he will customarily enter a futures market and sell the same or a related commodity short in an amount equivalent to the amount in inventory. In this way he reaches an even or balanced position between actuals and futures, so that any loss resulting from a decline in the market price of the *105 actuals will be offset pro tanto by the gains derived from closing out the futures at a commensurately lower cost. * * * [Wool Distributing Corporation, 34 T.C. 323, 331]
The essence of hedging, * * * is the maintenance of an even or balanced market position. It is a form of price insurance - often the only kind available for the purpose of avoiding the risk of changes in the market price of a commodity. * * * [Stewart Silk Corporation, 9 T.C. 174, 178]
Petitioner's commodities transactions in 1959 are easily disposed of. His dealings in soybeans resulted in a gain rather than a loss and the gain would have been much larger had it not been for a soybean transaction of 10,000 bushels opened on February 27, 1959, and apparently closed by maturity in March 1959, consummating the transaction at least three months before petitioner's soybeans were even in the ground. His dealings in corn futures during 1959 were all on the long side and thus exactly the opposite of a hedging transaction. Kenneth S. Battelle, supra.Petitioner's trading losses in 1959 arose almost entirely out of his futures transactions in rye and wheat, ($5,129.62 of the *106 claimed loss deduction of $5,516.12) crops which he did not raise that year and consequently such transactions could not have been hedges under any definition. Petitioner's commodities transactions in 1961 were far more numerous but analysis of them leads us just as surely to the conclusion that they had no relation to his farming activities and amounted also to pure speculation. His 1961 transactions in corn futures amounted to an over-all gain of $1,070.75. His over-all transactions in soybeans resulted in an over-all loss of $22,223.50. The discrepancy of $18 between this last figure and the $22,205.50 which petitioner seeks to deduct as "Hedge Account Loss-Grain" is unexplained. Critical examination of the 1961 futures transactions in soybeans reveals rapid changes of position in that there were twelve changes in January 1961, twelve in February, twenty in March, and six in April. Two of the 1961 transactions were opened and closed on the same day. Petitioner was in a long position (the exact opposite of the hedge) on two occasions in February and once in March. We have found as a fact that petitioner's 1961 soybean production was not more than 12,375 bushels. Such figure *107 was arrived at by resolving every doubt in petitioner's favor and it is probably in excess of petitioner's actual or anticipated production. Yet we find that petitioner's short position of soybeans was usually far in excess of such figure even reaching a high of 105,000 bushels between March 17 and March 22, 1961. All of the above-noted facets of petitioner's future transactions in soybeans in 1961 demonstrate that he was speculating rather than hedging. Cf. Kenneth S. Battelle, supra, pp. 126 and 127. In Corn Products Refining Co. v. Commissioner, 350 U.S. 46, the positions of the parties were reversed in that the taxpayer manufacturer, having insufficient storage facilities for corn, bought corn on the futures market to protect itself against increases in the price of the raw grain, selling such futures as it bought spot corn for grinding. It netted a profit on such futures dealings and contended for the gain provisions applicable to capital assets. The basic rationale of the decision of the Supreme Court is expressed in the language - We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart *108 from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. * * * We apply that same rationale to the facts in this record and conclude that there was no connection, no interaction, nor any relationship between petitioner's farm operations and his dealings on the futures commodities markets. We believe that the latter were entirely speculative and therefore, Decision will be entered for the respondent. Footnotes
1. Petitioner contends that a "small amount" of rye was raised in one of the years between 1958 and 1961, both inclusive, but absent any proof as to the year or the amount we have made this finding which excludes any rye production in 1959 or 1961.↩
*. In the commodity market September and November contracts represent new soybean crop months. March, May and July contracts represent old crop months.↩
**. In the commodity market September and November contracts represent new soybean crop months. March, May and July contracts represent old crop months.↩
*. Bought and sold same day. ↩
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. § 1.1233-1 [Income Tax Regs.] Gains and losses from short sales. (b) Hedging transactions. Under section 1233(g), the provisions of section 1233 and this section shall not apply to any bona fide hedging transaction in commodity futures entered into by flour millers, producers of cloth, operators of grain elevators, etc., for the purpose of their business. Gain or loss from a short sale of commodity futures which does not qualify as a hedging transaction shall be considered gain or loss from the sale or exchange of a capital asset if the commodity future used to close the short sale constitutes a capital asset in the hands of the taxpayer as explained in paragraph (a) of this section. * * *
(d)(2) Commodity futures. ( i) As provided in section 1233(e)(2)(B), in the case of futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange, a commodity future requiring delivery in one calendar month shall not be considered as property substantially identical to another commodity future requiring delivery in a different calendar month. For example, commodity futures in May wheat and July wheat are not considered, for the purpose of section 1233↩, substantially identical property. Similarly, futures in different commodities which are not generally through custom of the trade used as hedges for each other (such as corn and wheat, for example) are not considered substantially identical property. * * *