CLARENCE EDWARD HENDRICH and WILLA VAE HENDRICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hendrich v. Commissioner
Docket No. 280-78.
United States Tax Court
T.C. Memo 1980-322; 1980 Tax Ct. Memo LEXIS 265; 40 T.C.M. (CCH) 997; T.C.M. (RIA) 80322; August 18, 1980, Filed *265 Held, losses incurred by petitioners from commodity futures transactions in 1974 are deductible as capital losses; held further, petitioners are not entitled to elect the additional first-year allowance for depreciation on delinquently filed income tax returns for 1973 and 1974; held further, the addition to tax for failing to timely file their 1973 and 1974 income tax returns imposed upon petitioners. Clarence Edward Hendrich, pro se. Dale P. Kensinger, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPININ WILES, Judge: Respondent determined a deficiency of $2,445.67 in petitioners' Federal income tax for 1974 and additions to tax of $177.65 and $1,027.72 for the years 1973 and 1974, respectively. [1] The issues for decision are as follows: *268 1. Whether losses incurred by petitioners from commodity futures transactions in 1974 are deductible as ordinary or capital losses; 2. Whether petitioners are entitled to elect the additional first-year allowance for depreciation provided by section 179 [2] on delinquently filed income tax returns for 1973 and 1974; and 3. Whether the addition to tax provided by section 6651(a)(1) should be imposed upon petitioners for failing to timely file their 1973 and 1974 income tax returns. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Clarence Edward (hereinafter petitioner) and Willa Vae Hendrich, husband and wife, resided at Portis, Kansas, when they delinquently filed their 1973 and 1974 joint Federal income tax returns with the Internal Revenue Service Center in Austin, Texas, and when they filed their petition in this case. Petitioner operates a farm in the vicinity of Portis, Kansas, and grows corn, wheat and milo on his farm. He also grows wheat and corn under arrangements with various persons whereby he receives two-thirds of the wheat or corn *269 crop grown on their land and the landowners receive one-third of the crop. Each year petitioner grows approximately 12,000 bushels of wheat, 13,000 bushels of corn and 4,000 bushels of milo (these amounts include the wheat and corn petitioner grows on land owned by others). During 1973, petitioner harvested 10,000 bushels of wheat and 18,000 bushels of corn. The type of wheat petitioner grows is winter wheat. Winter wheat is planted between approximately September 1 and October 15 and is harvested during the summer of the following year. In the vicinity of Portis, Kansas, the winter wheat harvest generally begins shortly after June 25 and is completed about July 10. Since the price of wheat generally declines during the harvest season, petitioner usually does not sell his wheat at that time of the year. During the period July 1, 1973 to January 3, 1975, he sold wheat in the amounts and on the dates as follows: Date
Number of Bushels
7/2/73
510
7/3/73
559
7/5/73
1,717
7/26/73
283
7/28/73
1,115
8/14/73
200
8/15/73
3,913
9/18/73
1,000
10/26/73
319
8/30/74
2,000
9/12/74
1,000
10/2/74
1,000
1/3/75
3,000
During 1974, petitioner did not *270 transfer any wheat to the Commodity Credit Corporation (hereinafter CCC) and had no wheat harvested during prior years on loan to the CCC. Petitioner plants the corn he grows in the spring between approximately April 15 and May 30. He harvests the corn in the fall. Like wheat, the price of corn generally declines during the harvest season. During 1973 and 1974, petitioner entered into commodity futures transactions in wheat and corn as follows: Wheat
Date
Contract
Date
Gain or
Opened
Month
Position
Closed
Loss
11/27/73
May
Short
1/22/74
($5,775.00)
12/31/73
March
Long
1/2/74
March
Long
1/2/74
250.00
1/10/74
March Long
1/23/74
(350.00)
1/15/74
March
Long
1/15/74
150.00
1/24/74
March
Long
1/24/74
475.00
2/4/74
March
Lon g
2/4/74
May
Short
2/8/74
March
Long
2/8/74
(250.00)
2/15/74
March
Long
2/15/74
100.00
Corn
1/9/74
May
Short
1/23/74
(425.00)
1/10/74
July
Long
1/23/74
62.50
Petitioner incurred losses from these commodity futures transactions and deducted part of these losses in the amount of $5,900 as an ordinary loss on his 1974 return. Respondent, in his notice of deficiency, *271 disallowed the loss claiming it was not an ordinary and necessary business expense of carrying on petitioner's business of farming. During 1973, petitioner purchased for use in his farming operation the following items of machinery and equipment on the dates and in the amounts as follows: Date
Useful
Item
Purchased
Amount
Life (Years)
Auger
2/73
$ 610.75
7
1950 Ford truck
and hoist
1/73
1,027.00
7
1973 Ford station
wagon
1/73
2,511.50
7
Band saw
1/73
250.00
7
Mulch treader
7/73
2,304.72
7
1968 Ford tilt
cab truck
7/73
4,696.80
7
1955 Chevrolet
truck
7/73
1,058.00
7
New Holland combine
w/corn head
10/73
28,063.95
7
1966 Ford Mustang
3/73
939.85
5
The above items were used exclusively in the farming operation conducted by petitioner except that the 1973 Ford station wagon and the 1966 Ford Mustang were used only approximately 50 percent for business purposes. On his 1973 return, petitioner deducted an additional first-year allowance for depreciation of the above items in the amount of $8,282.51. Petitioner computed the amount of regular depreciation for the above items on his 1973 return using the straight *272 line method and continued using such method on his returns for subsequent years. During 1974, petitioner purchased for use in his farming operation the following items of machinery and equipment on the dates and in the amounts as follows: Date
Useful
Item
Purchased
Amount
Life (Years)
Stalk shredder
1/74
$1,960.00
7
Radial saw
1/74
418.72
7
1971 Ford Mustang
4/74
600.00
7
1/2 ton Ford truck
4/74
1,162.00
7
Table saw
4/74
72.00
7
The above items were used exclusively in the farming operation conducted by petitioner except that the 1971 Ford Mustang was used only approximately 50 percent for business purposes. On his 1974 return, petitioner deducted an additional first-year allowance for depreciation of the above items in the amount of $882.54. Petitioner computed the amount of regular depreciation for the above items on his 1974 return using the straight-line method and continued using such method on his returns for subsequent years. Respondent, in his notice of deficiency, disallowed the amounts petitioner deducted in 1973 and 1974 for additional first-year depreciation because petitioner's returns for those years were *273 not filed within the time prescribed by law, [3] resulting in an untimely election as provided by section 179(c)(1). Respondent also imposed additions to tax under section 6651(a) in the respective amounts of $177.65 and $1,027.72 for petitioner's failure to timely file his 1973 and 1974 returns. OPINION The issues for decision are: 1. Whether losses incurred by petitioner from commodity futures transactions in 1974 are deductible as ordinary or capital losses; 2. Whether petitioner is entitled to elect the additional first-year allowance for depreciation provided by section 179 on delinquently filed income tax returns for 1973 and 1974; and 3. Whether the additions to tax provided by section 6651(a)(1) should be imposed upon petitioner for failing to timely file his 1973 and 1974 income tax returns. Issue 1. Ordinary or Capital Loss
During 1974, petitioner, who operates a farm on which he grows wheat and corn, engaged in numerous commodity futures transactions in wheat and corn. Petitioner incurred losses from these transactions and deducted part *274 of these losses in the amount of $5,900 as an ordinary loss on his 1974 return.Respondent maintains that these losses are capital losses rather than ordinary losses. Whether petitioner's losses are ordinary or capital depends upon the nature of the transactions giving rise to the losses. If the transactions constituted hedging, petitioner's loss from such transactions is ordinary. Whereas, if the transactions were speculative, the loss is capital subject to the capital loss limitations of sections 165(f) and 1211. Section 165(c)(1) and (2) limits an individual's loss deductions to those incurred in a trade or business or a transaction entered into for profit. Section 165(f) limits the deductions for losses from the sale of capital assets to the amounts specified in section 1211. Section 1221 defines a "capital asset" as property held by a taxpayer and then specifies several types of property to be excluded from that definition. Since commodity futures contracts are not specifically excluded, they are generally treated as capital assets. Muldrow v. Commissioner, 38 T.C. 907 (1962). Under section 1233(g), however, there is an exception to the treatment of *275 commodity futures contracts as capital assets. That section provides that the special rules of section 1233 for treating short sales of commodity futures as sales of capital assets do not apply to hedging transactions in commodity futures. [4]Section 1.1233-1(b), Income Tax Regs., provides that, "[Under] section 1233(g), the provisions of section 1233 and this section shall not apply to any bona fide hedging transaction in commodity futures entered into by flour millers, producers of cloth, operators of grain elevators, etc. for the purpose of their business." In Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955), the Court held that the term hedging in section 1233(g) applies to any use of commodity futures that constitutes an integral part of the taxpayer's trade or business and is not limited to a "true hedge." *276 Hedges and hedging transactions have been defined by this Court as follows: A hedge * * * is not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself, as in the case of a speculative or capital transaction, but is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed * * * in normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future * * *. [Muldrow v. Commissioner,supra at 913.] The purchase or sale of a futures contract to offset the risk of holding another futures contract does not ordinarily qualify as a bona fide hedge because such risk is speculative in that it is not attached to the holding of a commodity expected to be used or marketed in a business. In order to have a bona fide hedge there must be: (1) a risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt *277 to so shift the risk. Sicanoff Vegetable Oil Corp. v. Commissioner, 27 T.C. 1056, 1067-1068 (1957), revd. on other issues 251 F. 2d 764 (7th Cir. 1958). Whether a particular transaction or series of transactions constitute hedging or speculation is a question of fact to be decided upon the facts and circumstances of each particular case. Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). During the period November 27, 1973 to February 15, 1974, petitioner entered into ten commodity futures transactions in wheat and two commodity futures transactions in corn. Of the ten contracts in wheat futures, eight were long positions and two were short positions. Of the two contracts in corn futures, one was a long position and one was a short position. Petitioner held five of the contracts in wheat futures for less than one day and the longest period he held any of such contracts was fifty-six days. As to the contracts in corn futures, petitioner held one for fourteen days and the other for thirteen days. At trial, petitioner conceded that a contract in the long position does not constitute a hedge for a grain farmer such as *278 himself.When asked on cross-examination, "Why did you sell short in November of '73?," petitioner responded, "That's the only way you can hedge, if you're a grain farmer." Petitioner thereby not only indicated he clearly understood that entering a commodity futures contract in the long position does not constitute a hedge but also that grain farmers such as himself can only hedge in the short position. See Battelle v. Commissioner, 47 B.T.A. 117 (1942). [5] Accordingly, no further analysis of the contracts in the long position is necessary for purposes of this case. In support of his contention that he was hedging with respect to commodity futures contracts in the short position, petitioner relies primarily upon two transactions he entered in the short position: the wheat futures contract entered into on November 27, 1973, by which he sold May wheat and the corn futures contract entered into on January 9, 1974, by which he sold May corn. Petitioner held the wheat futures contract until January 22, 1974, when he closed out the position at a loss in the amount of $5,775. He held the *279 corn futures contract until January 23, 1974, when he closed out at a loss in the amount of $425. The losses from these contracts totalling $6,200 exceed the loss of $5,900 petitioner claimed on his 1974 return. An analysis of these transactions clearly shows that they were speculative. In explaining his reason for opening the short position on November 27, 1973, petitioner testified that he "was hoping that the May contract would sell off, so I could take my ordinary income on the May contract." This explanation for opening the short position in May wheat futures on November 27, 1973, clearly indicates that petitioner's motive was to obtain a profit on the futures contract itself. Such motive is plainly contrary to the very nature of hedging transactions which is to insure against unfavorable fluctuations in the price of a commodity in which a position has already become fixed. Furthermore, the record shows that prior to the short sale on November 27, 1973, petitioner had sold nearly all the wheat harvested during the 1973 harvest season. Moreover, petitioner did not have on loan to the CCC any wheat from the 1973 harvest or from any prior harvest seasons. Therefore, petitioner *280 could only have been using the May contract to protect the price of the growing winter wheat crop he had planted just prior to the November short sale. The May contract, however, was not an appropriate contract for hedging against the price of the growing winter wheat crop. In the vicinity of Portis, Kansas, the winter wheat harvest does not begin until shortly after June 25. A May contract in wheat futures in the short position requires the person holding the contract to make delivery of the wheat during the motion of May. Accordingly, petitioner could not possibly have expected to harvest his wheat crop and deliver the winter wheat against the May contract. Petitioner admitted at trial that this would have been impossible.Petitioner would have been required to close out the May position substantially before the harvest season began. Between the time of closing the May contract and the June harvest, petitioner obviously would have received no price protection from the May contract. Moreover, since the price of wheat generally declines during the harvest season, petitioner would have been required to close out the May contracts in wheat futures just at the time he would have *281 needed price protection with respect to his growing crop against the seasonal decline. Therefore, the only price protection petitioner could have obtained with respect to his growing crop was to profit by the sale of the May futures contract itself in order to offset any loss that he might have sustained from the seasonal decline in the price of wheat that occurs during the harvest season. Such protection obviously constitutes speculation rather than bona fide hedging. Petitioner's explanation for closing out the short position in May wheat futures also suggests speculation. He testified that he closed out that position on January 22, 1974, because the price of wheat "was wild, and I was losing very much on my hedging." This reason for closing out the short position relates solely to gain or loss on the futures contract itself and not to any price protection for the growing winter wheat crop. While the foregoing analysis relates to the contract in wheat futures that petitioner contends was a hedge, further analysis reveals that the short sale in May corn futures on January 9, 1974, closed on January 23, 1974, was also speculative. On January 10, 1974, petitioner purchased five *282 contracts in July corn futures in the long position. He then closed out both the short and long positions opened on January 9, and January 10, 1974, respectively, on January 23, 1974. These two positions are, therefore, substantially equivalent to a spread which is contrary to petitioner's contention that the January 9, 1974, contract was a hedge with respect to his corn. In a spread, the trader simultaneously buys and sells related contracts. A common spread is the simultaneous long and short positions in two different delivery months of the same commodity on the same exchange. This is the type of spread petitioner assumed by opening offsetting positions in May and July corn futures on January 9 and 10, 1974.The purpose of a spread is to profit from change in price differentials. When petitioner purchased five contracts in May corn in the long position and the following day sold five contracts in July corn in the short position, he placed himself in a position where he could only profit by changes in the price differentials. If the price of May corn and July corn moves concurrently any profit on the May corn contracts would be offset by a corresponding loss on the July corn *283 contracts or vice versa. Since the positions opened on January 8 and 9 are offsetting positions, petitioner in effect assumed a spread position and since the only purpose of a spread position is to profit from changes in market price, such a position is speculative. See Sicanoff Vegetable Oil Corp. v. Commissioner, supra at 1070, n. 6. On the basis of this analysis, we must conclude that petitioner was speculating rather than hedging when he engaged in commodity futures transactions in 1974 with respect to wheat and corn. Accordingly, the losses he incurred from these transactions are capital losses rather than ordinary losses. Issue 2. Election of the additional first-year allowance for depreciation. Petitioner delinquently filed his joint income tax returns for the years 1973 and 1974 on August 7, 1974, and March 8, 1976, respectively. On his 1973 return, he claimed an additional first-year allowance for depreciation in the amount of $8,282.51, and, on his 1974 return, he claimed an additional first-year allowance for depreciation in the amount of $882.54. Respondent contends that petitioner is not entitled to an additional first-year allowance *284 for depreciation for those years because a taxpayer cannot elect such an allowance on delinquently filed returns. We agree. [6]
Section 179 provides for an additional first-year allowance for depreciation, at the election of the taxpayer, equal to 20 percent of the aggregate cost of qualifying property. For taxpayers filing joint returns, there is a limitation of $20,000 on the aggregate cost of property qualified for the allowance, entitling such taxpayers to a maximum allowance of $4,000 for a given taxable year. Section 179(b); section 1.179-2(a), Income Tax Regs. Section 179(c) provides that the election shall be made within the time prescribed by law, including extensions thereof, for filing the return for such taxable year. Sec. 1.179-4(a), Income Tax Regs. This restriction on electing an additional first-year allowance for depreciation has been recognized *285 and strictly enforced by this Court. See Sharon v. Commissioner, 66 T.C. 515, 533 (1976); Mitchell v. Commissioner,42 T.C. 953, 968 (1964). Petitioner delinquently filed his returns for the years 1973 and 1974 and has so stipulated.There is nothing in this record indicating petitioner obtained or even attempted to obtain an extension for filing those returns. Since petitioner did not make the election within the time prescribed by law, he is not entitled to an additional first-year allowance for depreciation for either 1973 or 1974. Issue 3. Section 6651(a)(1) Addition to Tax
Pursuant to section 6651(a)(1), respondent imposed upon petitioner 20 percent and 25 percent additions to tax for failing to timely file his tax returns for the respective years 1973 and 1974. Petitioner has stipulated that his 1973 return which should have been filed on April 15, 1974, was not filed until August 7, 1974, and that his 1974 return which should have been filed on April 15, 1975, was not filed until March 8, 1976. He argues, however, that his failure to timely file was due to reasonable cause. He claims that a taxpayer may have reasonable cause *286 if the failure to timely file results from the advice of a lawyer or accountant. Petitioner then contends that since he was acting as his own accountant, the addition to tax should not be imposed. Petitioner's argument is obviously without merit. A taxpayer's good faith reliance on the tax advice of professional third parties has been held to constitute reasonable cause. Twinam v. Commissioner, 22 T.C. 83, 91 (1954); Reliance Factoring Corp. v. Commissioner, 15 T.C. 604, 608-609 (1950). Petitioner, however, is a farmer, not a lawyer or accountant with expertise in tax matters. Therefore, when petitioner failed to timely file, he was acting on his own belief as to his duty to file rather than the advice of an attorney or accountant. A taxpayer who fails to timely file because of his own erroneous belief concerning his duty to file is subject to the addition to tax delinquency penalty imposed pursuant to section 6651(a)(1). Shomaker v. Commissioner, 38 T.C. 192, 202 (1962). Petitioner also argues that no addition can be imposed for 1973 because the notice of deficiency indicates that there is no deficiency for that year. This *287 contention is also without merit. Section 6651(a)(1) provides that in cases of failure to file any return on the date prescribed therefor, there shall be added to the amount required to be shown as tax on such return five percent of the amount of such tax for each month or fraction thereof that the return is delinquent up to a maximum of 25 percent of the tax required to be shown on the return. Section 6651(b)(1) provides: --For purposes of-- (1) subsection (a)(1), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return * * * [Emphasis added.] Petitioner filed a delinquent return for 1973 on August 7, 1974, four months after the due date as calculated pursuant to the rules prescribed by section 6651(a)(1). Petitioner's income tax liability for that year as determined by respondent in the notice of deficiency was offset by current investment tax credits and investment tax credit carryovers from prior years except for the amount of $888.25, which was offset by an investment *288 tax credit carryback from 1975. As noted above, section 6651(b)(1) provides that for purposes of the addition to tax for delinquent filing, the amount of tax required to be shown on the return is reduced by the amount of any credit against the tax which may be claimed on the return. Since petitioner was entitled to claim the current investment credit and the investment credit carryover from prior years on his 1973 return, no addition to tax could be imposed with respect to these amounts. The remaining tax liability of $888.25, however, is subject to the addition to tax because petitioner could not have offset such amount on a timely filed return for 1973 with the investment credit carryback from 1975. See C.V.L. Corporation v. Commissioner, 17 T.C. 812, 816 (1951). Thus, there is no merit to petitioner's contention that he is not subject to any addition to tax for 1973 simply because the notice of deficiency does not assert he owes additional tax for that year. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Respondent also determined a tax liability in petitioner's Federal income tax for 1973, but such liability was offset by current investment tax credits, investment tax credit carryovers and investment tax credit carrybacks which resulted in no income tax liability for that year. The investment tax carryback arose during 1975 and offset $888.25 of petitioner's tax liability for 1973.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. Petitioner delinquently filed returns for 1973 and 1974 on August 7, 1974 and March 8, 1976, respectively.↩
4. Section 1233(a) provides: (a) Capital Assets.--For purpose of this subtitle, gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.↩
5. See also Carpenter v. Commissioner,T.C. Memo. 1966-188↩.
6. Respondent also contends that petitioner's first-year allowance for depreciation is limited to $4,000 for the year 1973. Although we agree, in view that we have decided petitioner is not entitled to an additional first-year allowance for that year, the issue to which the argument is addressed has become moot.↩