HAROLD L. LEWIS and BERTEL LEWIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewis v. Commissioner
Docket No. 4979-77.
United States Tax Court
T.C. Memo 1980-334; 1980 Tax Ct. Memo LEXIS 255; 40 T.C.M. (CCH) 1049; T.C.M. (RIA) 80334; August 25, 1980, Filed Melvin A. Coffee and Richard B. Robinson, for the petitioners. Jeff P. Ehrlich, for the respondent. FEATHERSTON
MEMORANDUM FINDING OF FACT AND OPINION FEATHERSTON, Judge: Respondent *257 determined deficiencies in petitioners' Federal income taxes for 1969, [1]/ 1972, and 1973 in the amounts of $3,175.37, $17,081.04, and $16,171,39, respectively. Due to concessions by petitioners, the issues remaining for decision are: 1. Whether petitioners are entitled to deduct as ordinary losses under section 165[2] losses incurred in 1973 from trading in cattle futures contracts. [3]
2. Whether petitioners are entitled to deduct as ordinary losses under section 165 losses related to certain limited partnership agreements. 3. Whether petitioners are entitled to investment credits under sections 38, 46, and 48 for qualifying property of $16,883 and $1,953.09 in 1972 and 1973, respectively. *258 FINDINGS OF FACT At the time their petition was filed petitioners Harold L. Lewis and Bertel Lewis, husband and wife, were legal residents of Sioux City, Iowa. They filed their joint Federal income tax returns for 1969, 1972, and 1973 with the Internal Revenue Service Center, Kansas City, Missouri. 1. Cattle Futures Trading Issue
Since 1951, petitioner Harold L. Lewis (petitioner) has been employed by Max Rosenstock & Co. (Rosenstock), [4]/ which operates farmland, feedlots, feed machinery, and grain elevators and holds cattle inventories for resale to cattlefeeders. In 1973, petitioner worked in a management capacity in which he was involved in decisions on purchases and sales of cattle. During 1973, petitioner was a 3/7 partner in the A & L Ranch Partnership (A & L), which owned and operated feedlots, fed cattle on its own account, and sold cattle to packers. A & L also participated in ranching operations and in the business of commodity future sales. The *259 partnership placed cattle on feed for its own account. In 1973, it sold fat cattle [5]/ on the following dates and in the following numbers: Date of Sale
No. of Cattle [1]/
April 25
23
July 7
542
July 13
87
July 16
90
July 23
314
A & L purchased no feeder [6]/ cattle in 1973. Petitioner has also purchased, fed, and sold cattle individually since 1956. On January 1, 1973, petitioner had on hand 4,482 cattle. During 1973, petitioner sold fat cattle on the following dates and in the following numbers: Date of Sale
No. of Cattle
Jan. 22
2
Feb. 15
[1]271
16
[2] 192
17
[2] 125
588
Apr. 10
512
24
[2] 204
25
137
26
295
26
[2] 139
1,287
May 2
[2] 70
8
453
523
June 22
152
26
150
28
195
497
Aug. 2
54
3
206
14
413
21
302
30
519
1,494
Sept. 4
4
4,395
*260 In 1973, petitioner purchased cattle on the following dates and in the following numbers: Date of Purchase
No. of Cattle
May 1
[1] 76
July 16
[2] 820
Aug. 27
183
Oct. 3
782
Nov. 27
[2] 207
Nov. 27
1,900
3,968
Petitioner generally held feeder cattle for a period of more than 6 months. Due to factors such as the petroleum embargo, consumer beef boycotts, meat price freezes, volatile grain prices, and the Food and Drug Administration ban of DES (a feed additive hormone), the cattle market was very uncertain in 1973. In general, cattle prices rose during the first three quarters of the year and fell in the last quarter.The volume of trading in the feeder cattle futures market was very small. In 1973, petitioner opened and closed approximately 1,228 cattle futures contracts, all of which provided *261 for delivery either in February, April, June, August, October, or December of that year or in February, April, June, or August, 1974. Only one of these transactions was a short sale. Approximately 62 percent of these transactions were completed within 30 days; approximately 8 percent or 101 were day trades, or trades opened and closed the same day. With few exceptions, transactions closed before late August 1973 produced profits and those closed later produced losses.Petitioner closed out all futures contracts by the end of 1973. 2. Margin Account Losses Issue
Until its liquidation in 1972, Business Services Unlimited, Inc. (BSU), an Iowa corporation, operated a commodity futures sales office in Denver, Colorado, under the name of Weinberg Brothers and Company. After BSU's liquidation, A & L and, at times, John J. Surette (Surette) operated this office. In 1973, BSU was a Colorado partnership. In 1973, Commodity Traders Ltd. (CTL) was a joint venture qualified to do business in Missouri. Weinberg Brothers and Company agreed to pay petitioner a portion of commission income for commodities futures trades he solicited. In order to obtain additional customers for his *262 trade or business of selling commodities futures contracts, he decided to form limited partnerships to trade in commodities futures. By a limited partnership agreement dated March 1, 1973, BSU as general partner, Surette as special general partner, and specified limited partners formed a partnership called BSU No. 102, account No. 40104 (BSU No. 102). By an agreement dated July 6, 1973, BSU as general partner, petitioner as special general partner, and specified limited partners formed a limited partnership called BSU No. 104, account No. 40603 (BSU No. 104). By agreements dated July 30, 1973, and August 11, 1973, CTL as general partner, petitioner as special general partner, and specified limited partners formed partnerships named Commodity Trading Partnerships No. 101 and No. 102 (CTP Nos. 101 and 102), respectively. Petitioner signed each of the agreements on behalf of either BSU or CTL as an authorized officer. He also formed partnerships named BSU Nos. 101, 103, and 105. As stated in the agreements, the purpose of each partnership was to deal in commodities futures and related securities. Each agreement provides for capital contributions solely from the limited partners. *263 Except for BSU No. 102, each agreement allocates 20 percent of partnership profits to the general partner and 80 percent to the limited partners; BSU No. 102 provides that all net partnership profits be allocated to the limited partners. With respect to salaries, drawings, and interest on capital contributions, the agreements provide in part: The General Partner shall * * * designate the trading agent of the partnerships, shall execute all transactions for the partnership, and shall be entitled to all normal commissions arising in the course of the business activities of the partnership. The agreements provide that the general partners bear no partnership losses except as follows: The General Partner and the Special General Partner hereby undertake to pay all margin account balances, as and when they become due, without reimbursement therefor from any of the Limited Partners, to the extent that there are insufficient undivided profits in the partnership to cover the margin calls or unpaid margin accounts. * * * Under each of the agreements, a limited partner was liable for no losses in excess of his contribution to capital. Petitioner guaranteed payment of the margin account *264 balances and all losses in excess of the initial investment made by each limited partner in order to attract investors in the limited partnerships. Petitioner wrote letters dated December 16, 1973, to certain limited partners of CTP Nos. 101 and 102 and letters dated December 17, 1973, to certain limited partners of BSU No. 105. Each letter contains the following sentence: This letter will fulfill my guarantee to you against any loss to you beyond the [dollar amount] original margins advanced by you on commodity transactions entered into in 1973 for our joint account at my suggestion, for which I advanced funds or made commitments on your behalf on the strength of my guarantee to you. 3. Investment Credit
In 1972, petitioner paid $16,883 for installation of a concrete driveway with manholes at the O Street gasoline filling station which he owned in Lincoln, Nebraska. Two-thirds of the concrete driveway covered the buried gasoline tanks and approaches, the pumps, and the islands. In 1973, petitioner paid $1,953.09 for labor, material, and use of equipment to remove a portion of the old driveway and install a new driveway between pumps at a gasoline filling station *265 which he owned on Cornhusker Highway, Lincoln, Nebraska. All of this driveway covered the gasoline tanks; the gasoline tanks contained submersible pumps, electrical conduits, and electrial connections. The pavement was removed and replaced in order to replace the gasoline tanks which had deteriorated through normal wear and tear. A manhole was constructed to service the gas tanks and equipment in them. Petitioner chose concrete rather than a less permanent substance, such as asphalt, to reduce the frequency of paving the driveway. He used concrete for the one-third of the O Street driveway which did not cover equipment in order to provide a uniform appearance. On a worksheet for their 1973 income tax return, petitioners listed the following amounts as losses: BSU 101
$ 90,349.55
BSU 102
117,186.70
BSU 103
101,295.00
BSU 104
199,410.00
$508,241.25
BSU 105
$166,155.00
CTP 101
124,597.50
CTP 102
85,657.00
$376,409.50
On Schedule D of their 1973 Federal income tax return petitioners listed as a short-term capital loss $814,938.81 for "Loss on Comodity Futures Contracts" and $440,226.06 for net loss from partnerships and fiduciaries. These *266 amounts were derived from the worksheet as follows: $334,370.25
"commodity losses as shown by ledger"
508,241.25
($842,611.50)
27,672.69
"commission income received on above accounts"
($814,938.81)
($376,409.50)
( 63,816.56)
"loss thru A & L Ranch"
($440,226.06)
Petitioners reported $80,327.31 as commission income on their 1973 Federal income tax return. On their 1972 return, petitioners listed $45,519.53 as qualified new investment credit property with a life of 7 years or more. Of that amount, respondent determined that $16,883 was spent for pavement which constituted nonqualifying property. On their 1973 return, petitioners listed $9,388.66 as qualified new investment credit property with a life of 7 years or more. Respondent determined that $1,953.09 of that amount was attributable to pavement, which constituted nonqualifying property. OPINION 1. Cattle Futures Trading Issue
In 1973, petitioner engaged in the cattlefeeding business and traded in live cattle futures contracts. According to petitioner, he traded in live cattle futures in order to hedge against cost increases in feeder cattle, the principal raw material in his cattlefeeding *267 business. Relying on Corn Products Co. v. Commissioner,350 U.S. 46 (1955), and its progeny, he argues that losses realized upon the disposition of the live cattle futures contracts are ordinary losses. If this Court finds that some of the contracts were not hedges, he contends in the alternative that at least that portion equivalent to the 3,892 feeder cattle actually purchased are properly treated as hedges. Respondent, on the other hand, argues that petitioner traded in cattle futures for investment purposes and that attendant losses are, therefore, capital losses. We agree with respondent. Under section 165(a) and (c), [7]/ an individual may deduct losses incurred either in a trade or business or in a transaction entered into for profit. Subsection (f) limits the extent to which losses from sales or exchanges of capital assets are allowed."Capital asset" is defined in section 1221 as "property held by the taxpayer (whether or not connected with his trade or business)." Certain types of property are specifically excluded from capital asset status by that section. *268 In Corn Products,supra, the Supreme Court held that corn futures purchased and sold by the taxpayer were not capital assets even though the futures were not covered by the exclusions set forth in the predecessor of section 1221. The taxpayer sold items made from corn primarily under contracts providing for sale at the lower of a fixed or date-of-delivery market price. When the price of spot corn increased, the taxpayer, who had limited storage facilities, purchased corn futures as a means of assuring future supplies less expensive *269 than constructing additional storage facilities. It took delivery of corn as necessary to its manufacturing operations and sold the remainder. Emphasizing that the taxpayer's sales policy rendered it vulnerable to corn price rises and that the futures purchases assured a cheap source of supply, the Supreme Court found the futures transactions closely geared to the company's manufacturing business and resultant gains taxable as ordinary income. The Court relied in part on lower court fact findings that the futures transactions were an integral part of the manufacturing business and testimony that these were initiated in order to protect against price rises in the raw material and to assure a partial supply of the raw material. The Corn Products doctrine has been applied, and ordinary losses allowed, where the taxpayer traded in commodities which were not materials used in its business if, due to price correlations, such trading could be used to protect against adverse price fluctuations in a material used in the business. Kurtin v. Commissioner,26 T.C. 958 (1956) *270 (short sales of butter futures to protect against cheese price decline).
Petitioner argues that he traded in fat cattle futures in order to protect against increases in the price of feeder cattle. Even assuming that fat cattle futures trades provide an appropriate means of protecting against price increases in feeder cattle [8]/ petitioner traded about 1,228 fat cattle futures contracts. Depending on the method of equating one fat cattle futures contract to feeder cattle, [9] the contracts traded are equivalent to between approximately 45,000 and 76,000 feeder cattle. The volume of trading represented by either figure far exceeds not only the 4,482 cattle on hand at the beginning of the year or the 3,892 which he in fact purchased but even the 10,000 to 12,000 cattle petitioner testified he anticipated purchasing in 1973.Such a discrepancy is indicative of speculation. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. 1056, 1070 (1957), revd. on other grounds 251 F.2d 764 (7th Cir. 1958). [10]
*271 Moreover, there is no relation between the delivery dates in the contracts and the dates on which petitioner purchased feeder cattle. Contracts were purchased for February, April, June, August, October, and December, 1973, and February, April, June, and August, 1974, whereas no significant cattle purchases were made until midyear. Similarly, although the general holding period for feeder cattle was more than 6 months, that of the majority of contracts was less than 30 days. Such discrepancies have been cited by courts upholding capital asset treatment. Battelle v. Commissioner,47 B.T.A. 117, 127 (1942). Indeed, petitioner's pattern of trading suggests that he traded in the cattle futures market simply to make profits on the transactions themselves. His practice of almost invariably taking long positions was natural in a rising market, such as the fat cattle futures market was until late August 1973. By closing out these contracts after relatively brief holding periods, petitioner almost uniformly profited prior to the late summer price decline. Furthermore, while terming his cattle futures trades "hedges" or "protection" against increases in the price *272 of feeder cattle, petitioner in his testimony revealed that he defines those terms as making a profit on his cattle futures trades and using that gain in another operation, a purpose which does not entitle the taxpayer to ordinary loss treatment. United States v. Rogers,286 F.2d 277, 282 (6th Cir. 1961). Thus, he testified: Q. And therefore, you use your long position in the live cattle future market to do what with relation to the replacement feeder cattle? A. Well, you used them to protect yourself in that you have the profit from the trade of the live cattle futures. You use that money to put into the actual live cattle that you have to buy to go into your feed lots.
From subsequent references to certain contracts bought and sold the same day, it again appears that petitioner equates "protection" with "profits." He testified: "They made profits. They made protection." Relying on the testimony of Forrest E. Walters (Walters), petitioners argue that holding contracts as long as petitioner held feeder cattle would have impaired his flexibility in dealing with a changing market. He maintained such flexibility, they explain, by frequent trading and thus *273 he traded a large volume of contracts. According to petitioners, the relevant number of contracts with which purchases should be compared is, therefore, the net amount open on a given date. The greatest number of contracts open, they claim, were the 115 held on October 2, 1973. Assuming 60 cattle per contract, the equivalent number of feeder cattle held was 6,900, less than the amount which according to his testimony he intended to purchase in 1973. In our view, flexibility such as petitioners describe is necessary only for one attempting to profit on the futures trades themselves, in other words, a speculator. Indeed, what Walters described in the name of "discretionary hedging" appears to be simply an investment strategy aimed at earning profits. Stating that "an individual is justified in holding positions as hedges for a shorter period of time and turning them when it's appropriate to do so," he defined appropriateness as "when market trends turn against you." Or again he explained his general approach as follows: And so, you try, in order to protect the value of your inventory, to sell into a declining market or to buy into an up trending market.
Petitioners distinguish *274 two types of hedges, what they term the "partial" hedge, as used in Corn Products, and the "classical" hedge. They define the latter as the maintenance of an equal but opposite position in the futures market in order to minimize the effects of unanticipated price fluctuations and to lock in a profit. According to petitioners, respondent argues that the transactions at issue here do not constitute hedging because he fails to acknowledge any but the latter type of hedge. Petitioner's trading was, in their view, used as a partial hedge. However, as we have stated, petitioner traded, unlike the taxpayer in Corn Products, not to protect against the costs of a related business but for an independent investment purpose. Petitioners further rely on the fact that the futures contracts were for a commodity, fat cattle, related to their cattlefeeding business and that petitioner was able, and did, with respect to at least some contracts, actually take delivery of fat cattle. Yet after taking delivery, petitioner quickly sold the cattle. He did not use them in his cattlefeeding business. Although the Corn Products line of cases does not require that the commodity in which futures *275 are traded in fact be delivered and used in the related business ( Kurtin v. Commissioner,26 T.C. 958 (1956), ability to take delivery is relevant, we believe, only if coupled with use in that business. Arguing that the trading at issue was not speculative, petitioners note the relatively low percentage of day trades, and the absence of switches, i.e., rapid changes from short to long positions, and of straddles or spreads, i.e., a simultaneous placing of long and short positions in the same commodities futures market. They compare the holding periods favorably with those in Oringderff v. Commissioner,T.C. Memo. 1979-93, in which 28 percent were day trades and only one contract held as long as a month. As we have discussed, the holding periods for the futures were generally much shorter than those for the actual cattle. Therefore, the fact that day trades are relatively fewer and holding periods generally longer than in Oringderff is without legal significance. In the context of a rising market, such as the fat cattle futures market throughout most of 1973, a failure to sell short hardly belies a speculative motive.For a speculator could, *276 as petitioner did, profit simply by buying cattle futures contracts and selling when the price rose. Although their petition apparently placed in issue the characterization of futures contracts in other commodities, petitioners neither introduced evidence at trial nor contend on brief that such contracts were not held as capital assets. Yet patterns which they cite to establish that the cattle futures trading was used as a hedge are equally characteristic of the trading in other commodities. For instance, only 5 of 37 oil, 5 of 60 hog, and 10 of 285 corn futures contracts were day trades. The relative proportion of the corn futures is even smaller than those of the fat cattle futures. Similarly, petitioner consistently took long positions in these commodities. Thus, as with his fat cattle futures, there are no spreads or straddles. Alternately, petitioners rely on Walters' "nearest equivalent position" analysis to establish that some, if not all, of the futures contracts were hedges. Their expert witness noted three dates on which feeder cattle were purchased, July 16, October 3, and November 27. Walters then determined the number of contracts which petitioner received as *277 hedges, that number equal to the amount of cattle which petitioner reasonably intended to purchase on the first date, 64 to 75, and which he actually purchased on the two later dates, 13 and 35 contracts, respectively. In Walters' view, petitioner reasonably intended on July 16 to purchase feeder cattle equal to either his January 1 inventory or total purchases for the year. Finally, he noted the nearest prior date on which petitioner held the same number or more futures contracts. With respect to the October and November purchases, he considered only October and December contracts, respectively. These are July 5 with 69 contracts, September 17 with 25 contracts, and October 29 with 105 contracts. He then aggregated total gains and losses for contracts purchased on each date and concluded that the portion allocable to hedges was an ordinary loss. We do not find this analysis persuasive. The record contains no basis for a conclusion that petitioner intended to be, as Walters puts it, fully hedged on any of these three dates. In fact, there is no evidence before us that petitioner bought some futures contracts for speculation and others as protection against the cost of his *278 replacement feeder cattle. Also Walters' methodology is inconsistent. He compares the number of contracts held on July 5 not with actual July purchases of 820 head, or 13 to 14 contracts, but with total purchases for the year, explaining that petitioner purchased fewer cattle than he had anticipated in July. Although petitioners claim that, due to market conditions, their purchases were unexpectedly low, there is no evidence that petitioner intended to purchase a full year's inventory in July. Moreover, amounts actually purchased on each of the three dates were the equivalent of 13 or 14, 13, and 35 contracts, respectively. Yet the contracts, which petitioner held and to which purchases were compared were much more numerous--69, 25, and 105, respectively. A disparity between contracts purchased and actual needs is an indication of speculation. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. at 1070. [11]/ Indeed, the discrepancies would be still greater had Walters included contracts held on those dates which provided for delivery in 1974 and, for September *279 17, those which provided for delivery in December 1973. According to Walters, he disregarded contracts with 1974 delivery dates on the grounds that such contracts are properly matched against 1974 feeder cattle purchases. We note, however, that with respect to the July contracts and purchases, he otherwise made no attempt to match contract delivery dates against actual purchases. 2. Margin Account Losses Issue
On their 1973 Federal income tax return, petitioners reported as capital losses amounts paid with respect to commodities futures contracts traded by seven limited partnerships. They now maintain that such amounts were incurred in petitioner's trade or business of selling commodities futures contracts and therefore constitute ordinary losses. Because the commodities futures contracts on which the losses were sustained are capital assets, respondent argues, the losses were correctly reported as capital losses. Moreover, even if the losses were integral to the trade or business of selling commodities futures contracts, petitioners have not, in respondent's view, established that such trade *280 or business was that of petitioner. We find for petitioners on this issue. Section 165(a) and (c), quoted in pertinent part in footnote 7, supra, generally allows an individual to deduct losses incurred either in a trade or business or in a transaction entered into for profit. Under subsection (f), losses from sales or exchanges of capital assets are allowed only as provided in sections 1211 and 1212. Respondent concedes that petitioner in fact paid the amounts in issue. Petitioner testified that he paid such amounts pursuant to guarantees, and that the guarantees were made solely in order to obtain customers, and thus commission income, from his commodities futures trading. Consistent with this characterization of the guarantees as a personal obligation, letters which he wrote to certain limited partners after the losses were incurred refer to "my guarantee to you." Moreover, the agreements submitted in evidence provide that the general partner and the special general partner pay margin account balances to the extent that such balances exceed undivided partnership profits. The agreements for BSU No. 104 and for CTP Nos. 101 and 102 name BSU or CTL as general partner, *281 petitioner as special general partner, and specified individuals as limited partners. Thus petitioner was personally obligated to pay margin account balances with respect to these three agreements. In the BSU No. 102 agreement, Surette rather than petitioner is the special general partner. However, petitioner signed this agreement, as he did each of the others, as authorized officer of the general partner. Furthermore, the parties agree that BSU was operated by A & L, a partnership in which petitioner was a member owning a 3/7 interest. Although petitioner was not personally obligated by the written agreements to pay losses with respect to BSU No. 102, he in fact made such payments. Moreover, there is no evidence that Surette or anyone else paid any amounts pursuant to the guarantees. Accordingly, we hold that the losses were incurred in petitioner's trade or business of selling commodities futures contracts and are, therefore, deductible under section 165. Hogan v. Commissioner,3 T.C. 691, 694-695 (1944). Under all but one of the agreements introduced in evidence, petitioner would, respondent notes, share in profits from sales of the futures contracts, *282 which are capital assets within the meaning of section 1221. Apparently viewing the amounts at issue as part of the investment in such capital assets, he states that the payments are deductible only as capital losses. The existence of a substantial business motive for engaging in the transactions, such as receipt of commissions, does not, in respondent's view, transform the payments into ordinary losses. To be sure, under three of the agreements, the general partner--BSU or CTL--was entitled to 20 percent of net profits. As a member of BSU, a partnership, and CTL, a joint venture, petitioner apparently would have shared in this 20 percent. It is, we think, unrealistic to suppose that petitioner would have guaranteed the full amount of the margin account balances in order to derive a portion of the general parther's 20-percent share of profits. Rather we think he made the guarantees solely in order to obtain commission income. Hence the amounts at issue are, we believe, not part of an investment in the commodities futures contracts. Respondent also argues that it was the general partner who was liable for the losses under the agreements. Despite petitioner's testimony that *283 the limited partners looked to him for payment of losses, petitioner has not, in respondent's view, established that he was personally obligated to make the payments. As discussed above, it is clear that petitioner was personally liable for losses under three agreements. Furthermore, he testified that the limited partners expected him to make such payments with respect to all of the partnerships and we found his testimony credible. Even if the payments are deemed integral to the trade or business of selling commodities futures contracts, such trade or business was, respondent maintains, that of the general partner, not that of petitioner. Petitioner may not deduct under section 165 losses of a partnership solely on the grounds that he was a partner in it. Rosenthal v. Commissioner, 48 T.C. 515 (1967), affd. 416 F.2d 491 (2d Cir. 1969). As respondent correctly states, an individual may not deduct under section 165 the business losses of a partnership merely because he is a member in it. However, we have found that petitioner was himself in the trade *284 or business of selling commodities futures contracts and that he paid the amounts at issue in connection with that trade or business. We note that petitioners' 1973 Federal income tax return reports $80,327.31 as commission income. In the notice of deficiency, respondent included an additional $27,672.69 in ordinary income, an adjustment which petitioners do not dispute. The latter amount is attributed on petitioner's worksheet to contracts traded by BSU Nos. 101-104. 3. Investment Credit
In 1972 and 1973, petitioners claimed investment credits in the amounts of $16,883 and $1,953.09, respectively, which represent expenses of installing concrete pavements in gasoline filling stations which they owned. Respondent disallowed the credits on the grounds that the property did not qualify for the investment credit. We agree with respondent. Section 38 allows a tax credit for investment in certain property. The amount of the credit is determined under sections 46 through 50. See sec. 46(a)(1)(B), (a)(2), and (c). The credit is available for, in part, certain "tangible personal property. *285 " Sec. 48(a)(1)(A). [12]/ Whether property qualifies as "tangible personal property" is not determined by State law. Sec. 1.48-1(c), Income Tax Regs. Rather the regulations state that such property includes-- any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). An example of nonqualifying property is "paved parking areas." Sec. 1-48-1(c), Income Tax Regs. Tangible personal property specifically includes "all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure)." Hence, a gasoline pump, albeit annexed to the ground, constitutes tangible personal property. *286 Sec. 1.48-1(c), Income Tax Regs.
In our view, the concrete driveways constitute not tangible personal property within the meaning of section 48 but rather property in the nonqualifying category of "land and improvements there-to" within the meaning of section 1.48-1(c), Income Tax Regs. That regulation explicitly mentions a similar item, paved parking areas, as an example of nonqualifying property. As petitioners note, respondent has held that tanks and related piping constitute tangible personal property eligible for the investment credit (Rev. Rul. 74-602, 1974-2 C.B. 12) and that concrete foundations which are specially designed to meet the needs of stamping presses and which also serve as floor space are treated as part of the machinery. Rev. Rul. 79-183, 1979-1 C.B. 44. Petitioners state that concrete paving protects the gasoline tanks and related equipment better than asphalt paving, which would deteriorate more rapidly from dripping gas and from the pressure of heavy trucks driving on it. Hence petitioners argue that the concrete paving is an integral part of the tanks and related equipment, *287 which are eligible for the investment credit, and should itself qualify as tangible personal property. Petitioners' reliance on Rev. Rul. 79-183, supra, is mistaken. In concluding that a portion of the concrete mat for stamping presses qualified for the investment credit, the ruling described the mat's use as floor space as "strictly incidental to the use that necessitated its special design," i.e., support of the stamping presses. Rev. Rul. 79-183, supra, at 45. To the extent that the foundation did not support this equipment bur served only as a floor, the investment credit was denied. In contrast to the concrete foundation or mat described in the ruling, the paving in issue here is not specially designed to meet the needs of the underground equipment. Petitioners concede that only two-thirds of the O Street station driveway covers equipment and that concrete was used for the remaining one-third in order to provide a uniform appearance. There is no evidence that the remaining one-third is in any way dissimilar in its construction. The greater durability of concrete as compared to asphalt may aid in protecting underground equipment; however, *288 it is also useful in maintaining the driveway itself.Clearly, the driveway's function as a driveway is not strictly incidental to any use which it may have as protection for the underground equipment. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ The deficiency for 1969 is attributable to disallowance of an investment credit carryback from 1972.
2. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. 3. On their 1973 Federal income tax return, petitioners treated these losses as capital losses. In accordance with their present position, they claim that they overpaid taxes in 1973 in the amount of $22,505.08.↩
4. /↩ Although the parties have stipulated that petitioner's employment at Rosenstock began in 1951, petitioner stated at trial that the stipulation should have referred instead to the year 1952.
5. /↩ Cattle ready for slaughter are called "fat" or "live" cattle. In the testimony and in the briefs filed by the parties, these terms have been used interchangeably.
1. /↩ In addition, 32 of A & L's cattle died in 1973.
6. /↩ Cattle placed on an intensive feeding program in feedlots are called "feeder" cattle.
1. /↩ These are heifers. All others are steers. 2. Date of purchase unknown. All others were purchased in 1972.↩
1. /↩ Petitioner testified that these cattle were delivered pursuant to cattle futures contracts and sold by month end. All others were sold in 1974. 2. These are heifers. All others are steers.↩
7. /SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *↩
8. / Petitioner's expert witness, Forrest E. Walters, testified that, during the period from Jan. 1970 through July 1972, 72 or 73 percent of the variation in the price of feeder steer, 500-700 1bs., Omaha, was associated with the price of choice steer, average weight, Omaha. Noting the low volume of trading in feeder cattle futures during 1973, he maintained that trading in fat cattle futures could be used to protect against price increases in feeder cattle. On the other hand, respondent's expert witness, Joseph C. Johnston, opined that a cattlefeeder may not hedge by purchasing fat cattle futures since he would thereby increase his risk in the finished product of his business. Also, he challenged petitioner's price correlation methodology in that it matched prices of fat cattle to those of feeder cattle for the same month rather than for 6 months earlier. In his view, the two types of contracts have no true price correlation. ↩
9. Petitioner equated a fat cattle futures contract to 37 or 60 feeder cattle and respondent to 47 or 62.The first in each set of numbers is equal to the number of fat cattle in the contract and the second is derived by dividing the number of pounds in the contract, about 40,000 1bs., by the approximate weight of one such animal. ↩
10. Meade v. Commissioner,T.C. Memo. 1973-46↩.
11. /Meade v. Commissioner,T.C. Memo. 1973-46↩.
12. / Petitioners do not argue that the paving qualifies as "other tangible property" within the meaning of sec. 48(a)(1)(B). Clearly, the pavement is not used as an integral part of any activity specified in subparagraph (B) and does not constitute any type of facility specified in the subparagraph. Thus it does not satisfy the requirements of sec. 48(a)(1)(B)↩.